Nelson L. **COOPER**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 6986.

District of Columbia Court of Appeals.

Argued Jan. 16, 1974.

Decided Oct. 31, 1975.

As Amended April 1, 1976.

Robert Case Liotta, Washington, D.C., appointed by this court, for appellant.

James N. Owens, Asst. U. S. Atty. with whom Harold H. Titus, Jr., U. S. Atty., at the time the brief was filed, and John A. Terry and Daniel J. Bernstein, Asst. U. S. Attys., were on the brief, for appellee.

Before GALLAGHER, YEAGLEY and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellant was convicted by a jury of carrying a pistol without a license (D.C. Code 1973, § 22–3204), five counts of assault with a dangerous weapon (id., § 22–502), and negligent homicide (id., § 40–606). He challenges: (1) the quashing of his subpoena for police personnel files; (2) the exclusion of certain testimony relating to an alleged telephoned threat on appellant's life; and (3) the exclusion of testimony about appellant's reputation for truth and honesty. We find no error in the quashing of the subpoena, and conclude that the errors which were committed with respect to points (2) and (3) were harmless.[1]

I

On the night of December 4, 1971, off-duty police officer Louis Boyd was driving south on South Capitol Street, taking friends home. Among his four companions was Jerry Morris, another off-duty police officer. Boyd had his revolver with him; Morris did not.

Boyd reached the south end of the South Capitol Street bridge. Suddenly a red Chevelle, driven by appellant Cooper, pulled in front of his car and stopped. Boyd slammed on his brakes to avoid a collision.[2] The two cars remained stopped for a few seconds. Boyd saw one of the three passengers in the Cooper car "lean back, stick his arm toward the center of his waist area, and then lean forward to the driver." Boyd then told his companions that the people in the other car "might have a gun."

Boyd took his police identification folder and badge out of his pocket, held them in his left hand, and started to pull around Cooper's car. As Boyd and his companions moved slowly past, Cooper pointed a revolver at them and called: "Go on down the road or I'll blow your motherfucking head off."[3]

Boyd drove off rapidly and told his passengers to get down on the floor. He took out his revolver and placed it in his lap. Boyd continued on, for a mile or a mile and one-half, until he heard "a pinging sound of something striking the car." He then stopped his car in the middle of the road, leaving an open lane on each side in the hope that the Cooper car would go by. Instead of passing Cooper stopped his car a few feet to the right of Boyd's car, with its front even with Boyd's rear fender.

Boyd got out and moved quickly to the left rear side of his car, holding his badge in his left hand and his gun in his right. Leaning over his trunk, he faced the other driver and said twice: "Metropolitan police officer. Get out of the car."

1. The incident resulted in the death of a police officer. Appellant was sentenced to imprisonment for one year on the negligent homicide and carrying a pistol without a license convictions, and to one to five years on each of the five ADW convictions, all to be served concurrently. He was released from custody on February 1, 1974, two weeks after oral argument.

2. Cooper testified that he inadvertently cut off Boyd's car as he changed lanes, and that Boyd then switched on his high beams and followed closely until Cooper stopped. On this appeal, we must view the evidence in the light most favorable to the government. See Hamling v. United States, 418 U.S. 87, 124, 94 S.Ct. 2887, 41 L.Ed.2d 642 (1974); Wray v. United States, D.C.App., 315 A.2d 843, 844 (1974).

3. Cooper testified that he did wave a gun at the other people and say something that "meant for [them] to go, keep going." He said he did this because the people in Boyd's car were "acting [as if] they wanted to start some trouble".

Appellant then pointed a gun out of his window and fired at Boyd.[4] As Boyd ducked, Cooper fired a second shot, which struck the car door. Boyd then fired two shots at Cooper.

More shots followed, from both sides. During the gunfire, Officer Morris got out of Boyd's car; he was shot in the leg. According to a witness who had been driving along South Capitol Street, Morris grabbed his leg and fell back into his seat. Then he got up, steadying himself on the door, and moved between the two automobiles to the front of Boyd's car. The witness said Morris fell, and that "at about the same time that he fell the automobile, the red automobile [Cooper's], started moving forward." Another witness, who watched the incident from a nearby Bolling Air Force Base barracks, also saw Morris fall.[5] No one saw Morris alive again.

After several shots had been fired from each side, Cooper pulled his arm back into the car. Officer Boyd, correctly believing Cooper's gun to be empty, then ran to Cooper's car and fired one shot inside. The bullet apparently wounded Cooper. Cooper started to drive away, and swerved into Boyd's car. Boyd ran a short distance away, and turned to fire a final shot at the Cooper car. He watched as it drove over a sign on the median strip and proceeded south along South Capitol Street.

Boyd returned to his car, and drove off in pursuit of the Cooper vehicle. No one noticed the absence of Officer Morris. They had driven a short distance when Boyd noticed something ahead that "looked like a bundle of rags lying there in the street". Driving closer, he saw that it was the body of Jerry Morris. Morris had been run over and dragged for 300–400 feet, resulting in his death from multiple fractures and internal injuries.

A few minutes later, police found·Cooper. He was wounded, sitting in the passenger seat of the car he had been driving. Clothing · fibers and hair from Officer Morris subsequently were found on the undercarriage of the car. The gun Cooper had used was found in a wooded area, where Cooper said he had thrown it.

At trial, Cooper claimed self-defense. He testified that an unidentified man had telephoned a threat on his life to his place of work some four to six weeks before the shooting incident, and that the threat had been relayed to him by both· a fellow employee and his employer. Cooper stated the belief that the threat had come from a rival for the affections of a woman whom he had been dating. Earlier that same· evening, according to Cooper, he saw the woman's mother, who told him that her daughter was at the rival's apartment. Cooper and the woman's three sisters then went to the apartment. When they arrived, they suspected foul play, and they summoned police. Cooper testified that when the officers entered, "[t]here was blood, and the apartment was torn all up, like it had been a fight, but she wasn't there." He said he made a missing person report to the police the next day, but to his knowledge, she had not been found.

Cooper testified that the combination of the threat and his girl friend's disappearance made him apprehensive for his safety and caused him to carry a gun in his car. On the evening of the incident in question, Cooper transferred the gun to a friend's car, when he and the friend decided to visit the missing girl's mother.

---

4. Cooper's version of this phase of the incident was that Boyd blocked the road, forcing him to stop. Cooper testified that Boyd got out and fired twice before Cooper shot back. The jury rejected such testimony, and the jury's judgment, where it is "within the realm of reason," will not be disturbed on appeal. *Curley v. United States*, 81 U.S.App.

D.C. 389, 397, 160 F.2d 229, 237, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947) ; *see Malloy v. United States*, D.C.App., 246 A.2d 781, 782 (1968).

5. Although these events occurred at night, they were visible to witnesses since they took place under a street light.

## II

■ Appellant subpoenaed the police personnel files of Officers Boyd and Morris.[6] The government moved orally at trial to quash the subpoena. The government asserted a claim of privilege for the files, except those portions made public by statute.[7] The Metropolitan Police Department's Deputy General Counsel summarized the three basic reasons for the policy of confidentiality as "the privacy of the officer, the normal personnel executive interest of the department, and also the discipline of self-policing aspect of an investigation report that might be included." Defense counsel stated that he wished to look through the files seeking two types of material: (1) any indication of prior violent acts by Officers Boyd or Morris for use as evidence that they may have been the aggressors on this occasion, and (2) information about promotions or investigations of weapon firings which might show that Boyd had a motive for perjury.[8]

■ Defense counsel was unable to proffer that he had any reason to believe that either of those two types of material would be found in the officers' personnel files. The trial judge offered to inspect the files *in camera* to determine whether they contained relevant, admissible evidence. Defense counsel rejected that offer.[9] The court then quashed the subpoena on the grounds that "[i]t's really nothing more than a fishing expedition".[10]

---

6. The Deputy General Counsel of the Metropolitan Police Department testified that an officer's personnel file would include his "personnel record" (made public by statute at the time of trial, *see* n. 7 *infra*), places of assignment, commendations, copies of internal investigations, reports, letters of reprimand, diplomas, education reports, promotions, periodic ratings, nonmandatory recommendations for and against promotions, and any citizen complaints against the officer.

7. D.C.Code 1973, § 4–134, requires the Department to keep, *inter alia*, the following records:

 (1) General complaint files, in which shall be entered every complaint preferred upon personal knowledge of the circumstances thereof, with the name and residence of the complainant;

 . . . .

 (3) A personnel record of each member of the Metropolitan Police force, which shall contain his name and residence; the date and place of his birth; his marital status; the date he became a citizen, if foreign born; his age; his former occupation; and the dates of his appointment and separation from office, together with the cause of the latter; . . ..

At the time of trial, § 4–135 of the Code required that the materials described in § 4–134(1) (general complaint files) and § 4–134(3) (personnel record) be open to public inspection. Act of June 29, 1953, ch. 159, § 301(b), 67 Stat. 99. Under the current wording of § 4–135, this statutory avenue of public access is not applicable to the materials designated as "personnel record" under § 4–134(3). *See also* note 10 *infra*.

8. In a criminal proceeding charging assault or homicide, evidence of the victim's general reputation for violence, or evidence of specific prior acts of violence by the victim if such acts were known to the defendant, may be used to support the defendant's claim of self-defense. *See Hurt v. United States*, D.C. App., 337 A.2d 215, 217 (1975); *King v. United States*, D.C.Mun.App., 177 A.2d 912, 913 (1962); *Evans v. United States*, 107 U. S.App.D.C. 324, 325–26, 277 F.2d 354, 355–56 (1960); *United States v. Burks*, 152 U.S. App.D.C. 284, 286–87, 470 F.2d 432, 434–35 (1972); *Hayes v. United States*, 367 F.2d 216, 223 (10th Cir. 1966). *Cf. United States v. Agurs*, 167 U.S.App.D.C. 28, 30, 510 F.2d 1249, 1251, *cert. granted*, —— U.S. ——, 96 S.Ct. 390, 46 L.Ed.2d 301, 44 U.S.L.W. 3295 (1975).

9. *See Davis v. United States*, D.C.App., 315 A.2d 157, 161–62 (1974), in which the defendant, charged with sodomy and taking indecent liberties with a minor, was refused access to the victim's school records. Defense counsel proffered that he knew nothing about the victim's background, but wanted to examine the school records for evidence of possible prior homosexual tendencies. We held that the refusal to permit defense counsel to do so did not require reversal because (1) of the policies served by keeping such records private, and (2) an *in camera* inspection by the trial judge revealed nothing in those records which could have been useful to the defendant.

10. Appellant also asserts it was error for the trial judge not to order that any "general complaints" against the officers be given to the defense. Here we face a problem of

We conclude that the trial court properly sustained the challenge to the subpoena, and hence find it unnecessary to resolve the privilege question. *See United States v. Nixon,* 418 U.S. 683, 698, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Under Superior Court Criminal Rule 17(c), a subpoena duces tecum may be quashed if production of the materials sought would be "unreasonable or oppressive." In considering this standard, courts generally have followed the formulation expressed in *United States v. Iozia,* 13 F.R.D. 335, 338 (S.D.N.Y.1952). The *Iozia* test, as endorsed by the Supreme Court in the *Nixon* case, requires a party seeking a subpoena duces tecum to show the following:

(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a

"fishing expedition." *United States v. Nixon, supra* 418 U.S. at 699–700, 94 S. Ct. at 3103.[11]

In this case, the trial court effectively applied the standard enunciated in *Iozia.* The following exchange illustrates the record support for the finding that the defense was merely "fishing":

[DEFENSE COUNSEL]: . . . I really don't feel that the Court is in a position to determine what may or may not be relevant to my case. I feel that there are subtleties that counsel might want to bring out that the Court may not feel are relevant, and if I were only able to see them and determine that it would be impossible for me to know, and it's certainly also impossible for me to know ahead of time what to tell Your Honor what to look for. I don't know what's even in there.

THE COURT: That's exactly what I mean by fishing.

[DEFENSE COUNSEL]: Your Honor, I submit to the Court that I have a right to conduct a fishing expedition, if that's what it's called.

Thus, appellant's efforts under § 4–135 were misdirected. *See United States v. Ross,* 259 F.Supp. 388 (D.D.C.1966). However, despite the inapplicability of the statutory provisions and the department's legitimate policy concerns, such material still might be susceptible to production by a traditional subpoena, assuming satisfaction of the requirements of the *Iozia* doctrine. *See United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Iozia,* 13 F.R.D. 335 (S.D.N.Y.1952). *Cf. Mackey v. United States,* 122 U.S.App.D.C. 97, 98, 351 F.2d 794, 795 (1965).

---

terminology. The "general complaint files" referred to in § 4–134(1) do not include citizen complaints alleging police misconduct, but rather consist of reports reflecting complaints of criminal offenses allegedly committed by any citizen. Such reports are recorded on either P.D. Form 251 (offense report) or P.D. Form 253 (incident report), both of which are public documents. Complaints against police officers for alleged misconduct in their official capacity, whether lodged formally or informally, would not fall within § 4–134(1), nor would they normally be found in the "personnel records" required to be maintained by § 4–134(3). *See* Metropolitan Police Department General Order Series 1202, No. 1 (June 20, 1972). Complaints and internal memoranda of the type apparently sought by appellant are maintained separately, in furtherance of the policy objectives discussed above. This measure of confidentiality is consistent with the provisions of § 4–134(3), which enumerates only limited information as includible in an officer's personnel record, and with § 4–135, which specifically excludes subsection (3) from the § 4–134 material required to be kept "open to public inspection when not in actual use".

11. *United States v. Nixon* and *United States v. Iozia* involved Fed.R.Crim.P. 17(c), which is identical to Super.Ct.Cr.R. 17(c). Superior Court rules are construed in light of the corresponding federal rules when they are literally or substantially identical. *Campbell v. United States,* D.C.App., 295 A.2d 498, 501 (1972); *see* D.C.Code 1973, § 16–701. Like the federal rules, the Superior Court rules (at least where substantially identical to the federal rules) have the force of law. *Campbell v. United States, supra* at 501.

Enforcement of a subpoena under Rule 17(c) is committed to the sound discretion of the trial judge. Unless the trial court's finding is either arbitrary or without record support, its decision as to the necessity for the subpoena will not be disturbed on appeal. *See United States v. Nixon, supra* 418 U.S. at 702, 94 S.Ct. 3090. We find no indication of arbitrariness, and the trial court's finding is supported by the record. The ruling to quash the subpoena is sustained.

### III

Appellant's second argument concerns the trial court's exclusion of certain testimony to be given by Cooper's employer, James Young. Young was prepared to describe the contents of the telephone threat against Cooper which he allegedly relayed to appellant, but the trial court ruled that such testimony was inadmissible hearsay.

Appellant contends that the testimony should have been received because it was offered only to show that the witness told Cooper his life had been threatened (causing Cooper to become fearful for his safety), rather than to show that the content of the message was true (*i. e.*, that such a threat actually had been made). The proffered testimony was hearsay, but we agree that it was admissible. It should have been admitted to show the state of mind it might have induced in Cooper. *Cf. King v. United States*, D.C.Mun.App., 177 A.2d 912, 913 (1962); *Nick Bombard, Inc. v. Proctor*, D.C.Mun.App., 47 A.2d 405, 408

(1946). However, we conclude that its exclusion did not constitute reversible error.

Young was permitted to testify that a message was received at work, that he transmitted the message to Cooper, that Cooper became "frightened or scared" as a result, and that Cooper came to work with a gun a few days later. Additionally, appellant himself fully described the threat's content and its effect on his state of mind. Any possible prejudice was cured by the admission of this other evidence on the point sought to be proved. Since the exclusion of the subject testimony did not affect the substantial rights of appellant, it is not grounds for reversal. *See Johnson v. United States*, D.C.App., 298 A.2d 516, 518 (1972); *Shellie v. United States*, D.C.App., 277 A.2d 288, 289 (1971); D.C.Code 1973, § 11–721(e).

### IV

Appellant's final argument is that the trial court committed reversible error by excluding testimony that he had a reputation in the community for truth and honesty. Cooper argues that such testimony was admissible for two purposes: (1) to serve as substantive evidence, casting doubt on the probability of his guilt in and of itself, and (2) to rehabilitate appellant as a witness after the government attempted to impeach his credibility by the introduction of prior inconsistent statements.[12] We agree that some of the proffered testimony should have been admitted but conclude that its exclusion was harmless error.

Whether the character of the accused shall be placed in issue, and the

12. The admissibility of reputation testimony to rehabilitate a witness who is also the accused is unclear. Courts are divided on the general rule governing the use of testimony concerning reputation for veracity to rehabilitate a witness whose credibility has been attacked by prior inconsistent statements. *See* IV Wigmore, Evidence § 1108 (1940, Supp.1972); McCormick, Evidence § 49 (E. Cleary ed. 1972). The use of evidence of good character either in general, or for the particular goal of rehabilitating a witness

who has been impeached by prior inconsistent statements, serves the common defense objective of establishing the accused's credibility before the jury in the hope of enhancing reasonable doubt of his guilt. While the trial judge has broad discretion to prevent the trial from becoming a "parade of partisans", *see Shimon v. United States*, 122 U.S.App.D.C. 152, 156, 352 F.2d 449, 453 (1965), on the facts of this case the same analysis and conclusion is appropriate for both aspects of the asserted error.

scope of the evidence to be admitted thereon, is a matter largely within the control of the defendant. *See United States v. Lewis,* 157 U.S.App.D.C. 43, 48, 482 F.2d 632, 637 (1973). The prosecution is foreclosed from attacking the character of the defendant until it has been placed in issue by the defense, and even then is both limited to impeachment evidence relevant to the particular character trait asserted by the accused and confined by the further requirement that the probative value of the proffered character evidence outweigh its potential for prejudice. *See Adams v. District of Columbia,* D.C.Mun.App., 134 A.2d 645, 647 (1957); *Awkard v. United States,* 122 U.S.App.D.C. 165, 352 F.2d 641 (1965). The defense, on the other hand, may elect to raise any character trait antithetical to the charged offense, or may assert in proper circumstances a general reputation for honesty, veracity, or being peaceful and law-abiding. *Cf. Brown v. Haynes,* 385 F.Supp. 285, 295–96 (W.D.Mo.1974). The right of the accused to raise a defense based on good character is established, as "such testimony alone, in some circumstances, may be enough to raise a reasonable doubt of guilt." *Michelson v. United States,* 335 U.S. 469, 476, 69 S.Ct. 213, 219, 93 L.Ed. 168 (1948).[13]

In his trial, appellant's character witnesses were permitted to testify to his reputation for "peace and good order", but were barred from giving testimony as to his reputation for honesty and veracity, principally on the ground that such traits were insufficiently related to the violent offenses charged. The concerns which underlie the relevancy limitation upon character impeachment by the prosecution are somewhat different from those governing the restrictions placed on the defense. To avoid prejudice and the possibility of conviction on bad character alone, the prosecution is confined to the specific traits placed in issue by the defense. The defense, on the other hand, may offer evidence on any trait reasonably related to the elements of the charged offense.[14] While the trial judge has a responsibility to ascertain the competence of the proffered character evidence and to prevent the trial from straying into collateral areas, his broad discretion on these matters must be tempered with an awareness of the circumstances of the particular case and the accused's right to defend himself fully. Although a defendant's reputation for veracity (*i. e.,* for telling the truth) might not always be sufficiently germane to a charge of violent behavior to warrant its admission,[15] where, as here, it is reason-

---

13. In *Michelson,* the Court affirmed a bribery conviction, finding no error in asking witnesses testifying to the defendant's reputation for honesty and peace and good order whether they had heard of his prior arrest for receiving stolen property. *See Edgington v. United States,* 164 U.S. 361, 366, 17 S.Ct. 72, 74, 41 L.Ed. 467 (1896) (reversing a conviction for making a false deposition for the exclusion of testimony as to the defendant's general reputation for truth and veracity): "[G]ood character, when considered in connection with the other evidence in the case, may generate a reasonable doubt. The circumstances may be such that an established reputation for good character, *if it is relevant to the issue,* would alone create a reasonable doubt, although, without it, the other evidence would be convincing." (Emphasis added.) *See also United States v. Lewis,* 157 U.S.App.D.C. 43, 48, 482 F.2d 632, 637 (1973); *United States v. Fox,* 154 U.S.App. D.C. 1, 4–5, 473 F.2d 131, 134–35 (1972).

14. *See Shimon v. United States, supra,* 122 U.S.App.D.C. at 156, 352 F.2d at 453: "[A] Defendant may try, whether or not he takes the stand, to cast doubt on the probability of guilt by showing that some in his community believe him to be truthful and honest." We note that in *Shimon,* the defendant (who was charged with obstruction of justice and conspiracy to obstruct) did take the stand in his own behalf, as did the appellant in the case at bar. We therefore are not called upon to determine whether an accused might present witnesses solely to vouch to his good character without himself risking the perils of cross-examination. *Cf. Pendergrast v. United States,* D.C.App., 332 A.2d 919, 921 n. 1 (1975), in which the defendant also took the stand.

15. *See Michelson v. United States, supra; Darden v. United States,* D.C.App., 342 A.2d 24 (1975); *United States v. Lewis, supra* 157 U.S.App.D.C. at 50–51, 482 F.2d at 640–41.

able to conclude that the credibility of the accused may play a determinative role in the jury's decision, it is error to bar competent testimony as to a defendant's reputation for truthfulness.[16]

 Notwithstanding that narrow error, appellant was permitted to introduce substantial character evidence. *See United States v. Lewin,* 467 F.2d 1132, 1139 (7th Cir. 1972). Because the jury had that evidence before them and because appellant's reputation for veracity was not integrally related to the elements of the charged offenses, we are of the opinion that the error is not of constitutional dimension. *Cf. In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Therefore, the test for reversal is whether it can be concluded "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole that the judgment was not substantially swayed by the error." [17] The factors to be considered are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.[18] We have carefully examined the whole of the record, including the testimony of defendant's character witnesses which was admitted and the charge to the jury. That review persuades us that the error was harmless.

While the court barred evidence specifically directed to appellant's reputation for veracity, substantial testimony was admitted bearing on his credibility. Two of the passengers in the car which was driven by Cooper that night testified at length, fully corroborating his description of the incident. (The third passenger did not testify for either side.) As noted, Cooper's employer also testified, reinforcing appellant's story about having received a threat, becoming apprehensive, and beginning to carry a gun. The testimony of those three witnesses had the effect of indicating Cooper's truthfulness by supporting his version of the episode.

Additionally, appellant did present three character witnesses. Although they were not permitted to discuss his reputation in the community for truth and honesty, they were allowed to testify about his reputation for peace and good order. Appellant's former employer stated that everyone who knew Cooper liked him, and that he was "always peaceful." The wife of the man who owned the car driven by Cooper testified that people "all thought very highly of him, and they thought he was a fine fellow, easy to get along with, quiet, respectable, friendly—in all, an all-around nice guy." She stated that Cooper was "very peaceful and definitely nonviolent." Another man, who said he had known Cooper "[a]ll of his life", testified that Cooper had a reputation for being a peaceful, law-abiding citizen. That witness said that when people in the community heard about Cooper's alleged role in the shootout, "They just didn't believe it by—you know, by knowing him; they just couldn't see how this could happen, by knowing him." Finally (and perhaps dispositively), although the trial court apparently was not requested to do so by the defense, the court did give the standard instruction to the jury on character testimony, charging the jurors that such evidence alone may create a reasonable doubt of guilt.[19]

16. *See United States v. Fox, supra; United States v. Escamilla,* 467 F.2d 341, 348–49 (4th Cir. 1972) ; *United States v. Wooden,* 137 U.S.App.D.C. 1, 420 F.2d 251 (1969). Considering the specific circumstances of this case, we need not decide whether we would reach the same conclusion with respect to the somewhat different character trait of honesty.

17. *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). *See United States v. Lewis, supra* 157 U.S.App.D.C. at 57–58, 482 F.2d at 646–47.

18. *See Gaither v. United States,* 134 U.S. App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969).

19. The relevant instruction was as follows: The defendant in this case, Mr. Cooper, introduced evidence of his good reputation in the community. Such evidence may indicate to you that it is improbable that a person of good character would commit the crime charged ; therefore you should consider this evidence along with all the other evidence in the case in determining the guilt or innocence of the defendant. The

Since considerable testimony thus was presented on Cooper's behalf which both corroborated his version of the incident and tended to establish character inconsistent with the offenses charged, we conclude that the exclusion of specific testimony about his reputation for veracity had little or no effect upon the jury's decisions. Accordingly, it is not grounds for reversal.

See *Kotteakos v. United States*, 328 U.S. 750, 764-65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Lewis, supra*, 157 U.S.App.D.C. at 57-58, 482 F.2d at 646-47. See also *Lloyd v. United States*, D.C.App., 333 A.2d 387, 390-91 (1975); *Johnson v. United States, supra*, 298 A.2d at 518; D.C. Code 1973, § 11-721(e).

*Affirmed.*

circumstances may be such that evidence of good character may alone create a reasonable doubt of a defendant's guilt, although without it the other evidence would be convincing. Notwithstanding evidence of good character and reputation, however, you may convict the defendant if after weighing all the evidence, including the evidence of good character, you are convinced beyond a reasonable doubt that the defendant is guilty of the crime charged. *See D.C. Bar Ass'n, Criminal Jury Instructions for the District of Columbia*, No. 2.42 (2d ed. 1972).