### Raymond L. HARRIS, Appellant,

v.

### UNITED STATES, Appellee.

### No. 89–CF–1214.

District of Columbia Court of Appeals.

Argued Jan. 30, 1991.
Decided Dec. 18, 1992.

---

Anita Josey, Public Defender Service, with whom James Klein and Page Kennedy, Public Defender Service, Washington, DC, were on the brief, for appellant.

Steven N. Gersten, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Elizabeth Trosman, and William J. Hochul, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before STEADMAN and WAGNER, Associate Judges, and MACK, Senior Judge.

WAGNER, Associate Judge:

On October 28, 1987, appellant, Raymond Harris, shot Charles Langley in the abdomen in front of the home where both men lived. Appellant was convicted after a jury trial of assault with intent to kill while armed[1] and carrying a pistol without a license.[2] At trial, appellant contended that he shot Langley in self-defense. On appeal, appellant argues that the trial court erred in precluding him from cross-examining the complaining witness about, or offering extrinsic evidence of, two prior violent acts allegedly committed by Langley. Appellant also argues for reversal on the ground that the prosecutor improperly used his prior convictions to show that he was a violent person, likely to commit assaults. We find no abuse of discretion in the trial court's decision to exclude the evidence. On appellant's second claim of error, we find no grounds for reversal under the plain error standard.

I

At the time of the shooting, appellant and the complaining witness, Charles Langley, were residing in the same household with Langley's mother, stepfather, sisters, brothers, nephews and nieces. Appellant was the father of two children by one of Langley's sisters, Phyllis Hinton. The complaining witness testified that on the evening of the shooting he returned home about 9:00 p.m. after visiting his girlfriend, Ms. Alice White, and their two children. At the time, Langley complained to appellant that appellant's teenaged children were keeping him awake at night by running in and out of the house. Both men raised their voices during the discussion, and Langley's mother came downstairs to intervene. Langley testified that he suggested to appellant that they finish the conversation outside to keep from disturbing his mother. Appellant walked towards the den, and Langley thought that the conversation had ended. Langley went to the living room to get a cigarette, found he had none, grabbed his jacket, and left by the "front door" (on the side of the house) with the intention of going to the store for cigarettes. As Langley stepped out of the door, he heard appellant say, "[H]ere I am. I'm out here, now." Langley turned to see what appellant was saying, and appellant shot him in his lower abdomen. As Langley turned to go back into the house, he heard one more gunshot.[3] Langley testi-

---

1. D.C.Code §§ 22–501, –3202 (1989).

2. D.C.Code § 22–3204 (1989).

3. The government introduced evidence showing that appellant did not have a license to carry a pistol at the time.

fied that he never threatened appellant and that he had no weapon or any other object in his hands. He also testified that he knew of no reason for appellant to shoot him.

Appellant's version of the events differed in significant respects. Appellant testified that he heard Langley arguing with Phyllis Hinton about Toya, the daughter of appellant and Hinton. According to appellant, he tried to talk to Langley, who was cursing loudly and threatening to discipline Toya. Langley's mother came downstairs and asked Langley to stop cursing, but he continued to shout and began to threaten appellant after she went back upstairs. Langley threatened appellant's daughter, who was across the street at a neighbor's at the time, and when appellant intervened, threatened him. Langley's mother came back a second time and requested appellant to leave because it might calm Langley down.

Appellant left by the back door to reach his truck which was parked in the backyard. Appellant saw Langley standing near the front door and decided to cross the street to warn Toya not to come home until Langley calmed down. Before appellant could do so, he heard a noise behind him, turned and saw his stepson, Anthony, with a gun. Appellant grabbed the weapon from Anthony and immediately saw Langley standing on the porch, looking fierce and holding a large object (either a jack or a battery) above his head.[4] Appellant testified that he shot Langley with the gun he had taken from Anthony because he was afraid that Langley would strike him with the large object. After the shooting, appellant fled in his truck.

Appellant also testified that he wanted to warn his daughter because Langley, who had shot his own wife and burned down his own mother's house, was dangerous. These incidents are alleged to have occurred in 1973 and 1976, respectively. In response to questioning by the prosecutor, appellant admitted that he knew that Langley was found not guilty of the arson and that the shooting had not been prosecuted. The trial court denied appellant's pre-trial motion to cross-examine the complaining witness or to introduce at trial extrinsic evidence concerning these two prior incidents.[5] Appellant argues that this ruling was reversible error.

II

■■■ The trial court has broad discretion "to determine the substance, form, and quantum of evidence which is to be presented to a jury." *Johnson v. United States,* 452 A.2d 959, 960 (D.C.1982); *Hawkins v. United States,* 461 A.2d 1025, 1033 (D.C.1983), *cert. denied,* 464 U.S. 1052, 104 S.Ct. 734, 79 L.Ed.2d 193 (1984). Even if satisfied that the evidence is relevant and admissible under applicable evidentiary rules, the trial court must still determine whether the probative value of the evidence outweighs any unduly prejudicial effect when weighed against competing interests. *Johnson,* 452 A.2d at 960; *Hawkins,* 461 A.2d at 1033. Our scope of review of the trial court's ruling excluding evidence is whether the trial court abused its discretion. *Johnson,* 452 A.2d at 960.

■■■ Before considering whether the trial court abused its discretion in limiting the extrinsic evidence of the victim's prior bad acts, we turn to the question of admissibility of the evidence. There is no dispute that to support a self-defense claim, the accused may show prior acts of violence committed by the victim about which the accused knew. *Matter of M.W.G.,* 427 A.2d 440, 443 (D.C.1981); *United States v. Akers,* 374 A.2d 874, 877 (D.C.1977). Such evidence is relevant to the reasonableness of the accused's fear of the victim. *Cooper v. United States,* 353 A.2d 696, 702 (D.C. 1975); *King v. United States,* 177 A.2d 912, 913 (D.C.Mun.App.1962); *United States v. Burks,* 152 U.S.App.D.C. 284, 286–87 & n. 5, 470 F.2d 432, 434–35 & n. 5

---

4. A crime scene search technician testified in rebuttal that he examined the crime scene on the night of the shooting and found no objects of the type described on or around the porch.

5. Appellant proffered that witnesses would testify at trial that Mr. Langley set fire to his parent's house and that Langley's wife would testify that he shot her for no reason.

(1972). However, appellant argues that such evidence is also admissible on the issue of who was the first aggressor in an assault case to support the claim of self-defense.

■ The rule in this jurisdiction is that only in homicide cases may prior violent acts of the victim be introduced as evidence to prove that the victim was the first aggressor. *Akers, supra,* 374 A.2d at 877; *see also McBride v. United States,* 441 A.2d 644, 652–53 (D.C.1982). This is an exception to the general rule, which precludes evidence of any prior wrongs to prove that one acted in conformity with earlier conduct on a later occasion, carved out in recognition of the absence of the testimony of the homicide victim at trial. *Akers,* 374 A.2d at 877. Appellant argues that the *Akers* rule on the issue is extracted from dicta, and therefore, should be rejected. We do not regard as dicta the *Akers* holding on the question. Appellants were charged in *Akers* with assault on three police officers. Although the ultimate issue in *Akers* was whether appellants were entitled to pre-trial discovery under *Brady* [6] or Super.Ct.Crim.R. 16(b) of the police officers' personnel records reflecting their prior assaultive or violent conduct, one issue essential to the court's ruling was whether the documents sought were material to appellants' defense. The basis for the appellants' claim of materiality under Super.Ct.Crim.R. 16 was that such evidence would support their self-defense claims by showing the officers' violent character and hence, the likelihood that the

officers were the first aggressors. *Akers,* 374 A.2d at 877–78. The trial court granted the requested discovery on that theory. However, this court concluded that the trial court erred in its ruling because evidence of past, unknown specific violent acts by the complainant are not admissible at trial in a non-homicide case. *Id.*[7] Thus, the holding in *Akers* limiting the use of evidence of specific prior acts of violence by the victim on the first aggressor issue to homicide cases is not dicta, and we are bound to follow it. *Id.* at 877; *see also King, supra,* 177 A.2d at 913 (in assault cases, testimony by appellant of complainant's reputation for violence admissible on self-defense claim to show appellant's reasonable apprehension of fear). Therefore, the trial court did not err in refusing to admit the proffered evidence on the first aggressor issue here.

■ However, evidence of the victim's prior bad acts, which were known to appellant, were admissible in this case on the issue of the reasonableness of appellant's apprehension of danger at the time of the shooting, as the trial court properly concluded. *See Cooper, supra,* 353 A.2d at 702; *see also King, supra,* 177 A.2d at 913. Although appellant was permitted to testify about the two prior violent acts allegedly committed by the complaining witness, he argues that the trial court erred in refusing to allow him to offer extrinsic evidence and to cross-examine complainant about them. We find no abuse of discretion in the trial court's ruling.

6. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

7. Appellant also argues that the rule should be rejected because, as this court recognized in *Johns v. United States,* 434 A.2d 463 (D.C.1981), the cases relied upon in *Akers* reveal no limitation of admissibility of such evidence to homicide cases. 434 A.2d at 469 n. 8. The footnote in *Johns* goes even further and states that the cases on which *Akers* and *Cooper* relied for the proposition did not premise admissibility of reputation and bad acts evidence on homicide cases and "that the rule extended to all assaults," *Johns,* 434 A.2d at 469 n. 8. However, in *Johns,* there was no occasion for the court to consider the applicability of the rule to assault cases, and

none of the opinions relied on did so. *See United States v. Burks, supra,* 152 U.S.App.D.C. at 286–87, 470 F.2d at 437–38; *Evans v. United States,* 107 U.S.App.D.C. 324, 325, 277 F.2d 354, 355–56 (1960); *Griffin v. United States,* 87 U.S.App.D.C. 172, 174, 183 F.2d 990, 992 (1950). Therefore, appellant's argument that we are bound under *M.A.P. v. Ryan,* 285 A.2d 310 (D.C. 1971), by the decisions in *Evans* and *Griffin* to hold such evidence admissible in non-homicide cases must be rejected. Even assuming the *Akers* court announced a decision not strictly mandated by *Griffin* and *Evans,* the *Akers* decision is not inconsistent with those cases, and it remains controlling precedent in this case. *See M.A.P.,* 285 A.2d at 312 (only the en banc court will overrule prior decisions of this court).

■ Extrinsic proof that the complainant did in fact commit prior violent acts "serves to corroborate the defendant's testimony as to what he heard, and is therefore relevant to the question whether the defendant did, in fact, fear injury...." *Burks, supra,* 152 U.S.App.D.C. at 287 n. 5, 470 F.2d at 435 n. 5. Such proof is therefore probative and admissible on the issue of the reasonableness of the fear of the defendant who raises a self-defense claim. *Id.* Nevertheless, the trial court may still exercise its discretion to limit the "substance, form, and quantum of evidence" presented on the issue. *Johnson, supra,* 452 A.2d at 960; *Hawkins, supra,* 461 A.2d at 1033. The court may exclude such evidence, even when relevant, if its probative value is outweighed by the danger of its unduly prejudicial effect, *Hawkins,* 461 A.2d at 1033, or if the proffered evidence is cumulative, vague and uncertain. *Hurt v. United States,* 337 A.2d 215, 217 (D.C.1975).

■ In excluding the evidence in this case, the trial court considered that the two prior violent acts proffered occurred some thirteen and eleven years earlier and that defense counsel could proffer no further acts of violence by the complainant in the succeeding years.[8] Evidence which is remote in time to the events involved may be of scant probative value, particularly where there is no showing of the victim's violent character in the intervening years. *Hawkins, supra,* 461 A.2d at 1033. The court properly weighed in its determination the staleness of the proffered evidence and the absence of any showing that any later acts of violence occurred thereafter. *See id.*

The trial court also considered that Langley had been found not guilty of the arson and that the shooting incident, allegedly between husband and wife, had not been prosecuted. The trial court also indicated

that it gave consideration to the prejudice of a trial of those issues in this case. Under the circumstances, we find no abuse of discretion in the trial court's decision to exclude extrinsic evidence on the issue. The proffered prior bad acts had little probative value because of their extreme remoteness to the time of the shooting in this case. *See id.* If allowed, two separate mini-trials would have ensued concerning whether Langley committed the arson and the shooting offenses which would have been dependent upon the memories of witnesses which, no doubt, may have faded with time. There was also the prospect that such evidence would have confused the jury and unduly prejudiced the jury's fair consideration of the evidence in the case before it. *See id.* On this record, we find no abuse of discretion in the trial court's decision to restrict the prior bad acts evidence to appellant's testimony about his knowledge of the alleged events and how they shaped his fears that evening.

Appellant argues that although he was permitted to testify about his knowledge of the complainant's prior violent acts, their effect was nullified by the prosecutor's improper mischaracterization of the events. Specifically, appellant contends that the prosecutor implied in questioning him that Mr. Langley accidentally shot his wife and was innocent of the arson charges. The defense counsel timely objected to the questions, and after a recess and lengthy bench conference, the prosecutor rephrased the question.[9] The rephrased question was as follows:

> Mr. Harris, returning to your testimony concerning your awareness that Mr. Langley shot his wife, you're aware, aren't you, that that case did not go to trial? Yes or No Sir?

---

8. Although in making its ruling the trial court mistakenly indicated that there was a ten year limitation on the admission of other crimes evidence under *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), a review of the court's inquiry with counsel and its complete ruling reveals that the court properly gave weight to the age of the incidents, the absence of similar intervening acts while the complain-

ant and appellant lived together and interacted otherwise, and the prejudicial effect of the evidence.

9. Appellant conceded at trial, and does not challenge on appeal, that cross-examination by the government on the results of the prosecution for those prior violent acts was proper.

Appellant responded, "Yes, I'm aware of that." Defense counsel did not object to the rephrased question. The prosecutor then asked appellant whether he was aware that Mr. Langley was "found innocent" of those charges. Defense counsel's objection to the word "innocent" and insistence on the term "not guilty" was overruled. However, appellant responded that Langley was found "not guilty." Appellant contends that he was prejudiced by these questions and that because of them the jury did not use the evidence of the shooting and arson to assess the reasonableness of his actions. We disagree.

■■■ It is improper for a prosecutor in questioning to assert facts for which there was no evidence "or a reasonable ground to believe the truth of its implication." *Lee Won Sing v. United States*, 94 U.S.App. D.C. 310, 311, 215 F.2d 680, 681 (1954); *see also Ali v. United States*, 520 A.2d 306, 315–16 (D.C.1987). It is not clear from the record whether the prosecutor had a good faith basis for implying that the shooting was accidental. Nevertheless, corrective measures were taken immediately which eliminated any possible prejudice to appellant from the question. First, there was an objection and an intervening bench conference. The court required the prosecutor to rephrase the question in a form which was unobjectionable. Further, at the conclusion of the evidence, the court instructed the jury that the statements and questions by counsel are not evidence. The jury is presumed to follow the court's instructions. *Hairston v. United States*, 497 A.2d 1097, 1103 (D.C.1985). Under the circumstances of this case, the instruction adequately prevented any harm from the questions about which appellant complains.

### III

Finally, appellant argues that the prosecutor used appellant's prior convictions improperly to show his violent character. This challenge is addressed to a series of questions posed by the prosecutor to respond to statements about appellant's demeanor brought out during his direct examination.[10] Appellant argues that this

10. The direct examination proceeded as follows:
Q. Now, thinking back to this argument or the incident with Earl [Langley] inside the house, you told us his demeanor, what was your demeanor towards him?
A. I was extremely calm. Really, I just felt that Earl was just angry and he was trying to get something out, until after I realized he wasn't trying to explain it, you know. I just thought it was fruitless to even discuss it with him anyway.
Q. Did you display anger to him?
A. Anger?
Q. Yes.
A. No, not to him, but I felt anger.
Q. Did you display it at all?
A. No, not at all.
Q. And when you left the house, what was your feeling about whether this episode between the two of you was over or was going to continue?
A. I thought it was over. I mean, nothing had happened. I just wanted to make sure that it was over with my daughter. I wanted to make sure that she didn't walk in there while he was in the frame of mind that he was in and get hurt, and I had left there and wasn't going to be there to protect her.
On cross-examination, the prosecutor then asked the following series of questions:
Q. You're a calm person, Mr. Harris?
A. Reasonably calm.
Q. You were calm on October 28th, 1987?
A. Yes, I was.
Q. You never got upset?
A. Upset, no.
Q. And it was a matter of honor for you that you stood up when, as you say, Mr. Langley was picking on your wife, is that right?
A. It was a matter of honor.
Q. It was a matter of honor to yourself because you thought he was disrespecting you; is that right?
A. True.
Q. But you also claim you were afraid for your wife's safety; isn't that right?
A. Afraid for her safety?
Q. Yes.
A. Yes, not—
Q. And yet it's your testimony you walked out the back door while Mr. Langley remained behind in the house; isn't that right?
A. True.
Q. You were convicted in 1959 of an assault on a government reservation?
A. I was in prison and I saved a friend of mine's life.
Q. Oh, is that right? So, that isn't a proper conviction; is that your testimony?
A. Yes, it was a conviction.
Q. You assaulted somebody; is that right?
A. Yes, I did.
Q. You didn't keep your cool there, did you?
A. I didn't have no choice.
Q. How about 1962? You were convicted of assault with a deadly weapon, weren't you?

line of questioning was an attempt by the prosecutor to argue to the jury that because appellant had a record of assaults, he was not a calm person, but a violent one.

 While evidence of prior convictions is admissible on the issue of credibility, it is not generally admissible on the issue of guilt.[11] *United States v. Carter*, 157 U.S.App.D.C. 149, 150, 482 F.2d 738, 739 (1973). In *Carter*, the appellant denied on cross-examination that he had robbed the complaining witness and stated that he had no reason to do so when he was working. *Id.* at 151, 482 F.2d at 740. The prosecutor's next question was:

> "But in 1968 you were convicted of six counts of robbery and assault with a dangerous weapon, weren't you, on three different people?"

*Id.* The *Carter* court held that the evidence was inadmissible for the purpose of showing the defendant's predisposition to rob or that he committed the crime charged. *Id.* The court reversed the conviction, concluding that the prosecutor used the evidence improperly to defeat the rule, thereby prejudicing the defendant's case irreparably. *Id.* at 151–52, 482 F.2d at 740–41. Subsequently, this court held that it is improper to pair questions about a defendant's prior convictions for offenses similar to those on trial with questions which elicit a denial of the crime charged or a denial of a key element of the offense. *Dorman v. United States*, 491 A.2d 455, 459 (D.C.1984) (en banc).

 This case does not raise the issue of misuse of evidence of prior convictions in the same context as in *Carter* or *Dorman*. Here, there were several intervening questions before the impeachment which were not related to a specific element of the offense charged and which did not elicit a general denial of the offense.

However, the proscription against this type of improper use of prior convictions does not pertain solely to circumstances surrounding the commission of the offense. *See id.; see also Baptist v. United States*, 466 A.2d 452, 458 (D.C.1983). Appellant also argues, and the record supports, that the prosecutor used appellant's prior assault conviction for another improper purpose.

Specifically, appellant argues that the prosecutor's questions tended to convey to the jury the fact that appellant was not calm when he committed the assault for which he was convicted in 1959, and therefore, it was unlikely that he was calm when he had the confrontation with Langley which led to the shooting. Improper cross-examination may occur in a variety of ways. The manner in which evidence of prior convictions can be misused is not restricted to the circumstances presented in *Carter* and *Dorman*. Yet, the test set forth in *Dorman* provides an effective way to judge the propriety of impeachment in the unique circumstances of other cases. *See Dorman, supra,* 491 A.2d at 460. That test is:

> whether the prosecutor's reference to a defendant's previous conviction is such that, under the circumstances, reasonable jurors would naturally and necessarily regard the manner in which the impeachment is accomplished as implying that the defendant is guilty of the crime charged because he was guilty of past crimes.

*Id.* In applying the test, we look to the jury's reasonable perception of the impeachment evidence. *Id.* n. 6. Here the prosecutor used appellant's prior assault conviction to convey the impression that appellant likely committed the offense charged. The prosecutor asked the ques-

---

A. Yes, I was in and I pleaded guilty to the lesser charge which was in there when you point a gun at someone.

11. The testimony of a witness may be impeached with prior felony convictions and misdemeanors involving dishonesty and false statement. D.C.Code § 14–305(b)(1) (1989). Crimes of passion or those resulting from a short temper, such as simple assault, are excluded from

the misdemeanors which can be used for impeachment purposes. *Ross v. United States,* 520 A.2d 1064, 1065 (D.C.1987). It is not clear from the record whether the 1959 assault conviction was of the type which is a felony under federal law. However, its use for impeachment purposes was not challenged in the trial court, and is not raised on appeal.

**148**

tions in such a way as to leave the impression that because appellant had been convicted of prior assaults and was not calm then, he probably committed the assault in this case in which he claimed to have been extremely calm during the argument which preceded it. Under the *Dorman* test, we conclude that the impeachment was accomplished in an improper manner.

■ Since appellant did not object to the improper use of the prior convictions, we review for plain error. *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc); *Dorman, supra*, 491 A.2d at 461, 464. We will reverse only if the error is "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts*, 362 A.2d at 709. A number of factors are pertinent to our evaluation of the error under that standard, including the seriousness of the error, the weight of the evidence of appellant's guilt, and any curative instruction. *See Dorman*, 491 A.2d at 464.

■ Evidence of self-defense was present; therefore, the government had the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *See Kelly v. United States*, 124 U.S.App.D.C. 44, 45 n. 1, 361 F.2d 61, 62 n. 1 (1966) (burden on government to disprove self-defense beyond a reasonable doubt); *see also* District of Columbia Criminal Jury Instructions, No. 5.13 (3d ed. 1978). Although the evidence that appellant shot the victim was overwhelming, the evidence essential to the prosecutor's burden to prove that appellant did not act in self-defense presented a closer case. In a close case, whether the trial court gave an immediate cautionary instruction about the limited use of such evidence is particularly important in an evaluation for plain error. Here, the trial court did so, explaining that appellant's prior convictions could be used only in·evaluating his credibility and not as evidence of guilt. Again, in final instructions, the trial court correctly instructed the jury

on the limited use it could make of evidence of prior convictions of a defendant and the prohibition against considering them as evidence of guilt. The prosecutor also summarized the instruction in closing argument and alerted the jury that the court would so instruct them. Given the substantial evidence of appellant's guilt, the nature of the improper cross-examination and the extent of the corrective measures taken at trial to cure it, we cannot say that the error was "so clearly prejudicial to substantial rights that the fairness and integrity of the trial" was jeopardized. *See Watts, supra*, 362 A.2d at 709.[12]

For the foregoing reasons, the judgments of conviction hereby are

*Affirmed.*

STEADMAN, Associate Judge, concurring:

I concur in parts I and II of the majority opinion and the conclusion in part III that the prosecutorial questioning did not rise to the level of "plain error." This being the case, I would not and do not reach the issue, unnecessary for the disposition of this appeal, whether that questioning was error at all.

12. Appellant raises briefly two other claims of improper prosecutorial conduct. As to one, an objection was sustained to the question asked by the prosecutor, and the misphrasing of the question in any event rendered it harmless. The second claim relates to the prosecutor's argument concerning the assessment of the credibility of the complainant and appellant based on evidence of prior convictions, an argument which at trial appellant conceded to be permissible. We find no reversible error with respect to either claim.