*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CO-1171

TIMOTHY D. DUGGER, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2015-CF1-012558)

(Hon. Judith Bartnoff, Trial Judge)

(Submitted January 21, 2022                    Decided June 8, 2023)

*Vincent A. Jankoski* and *Christine Pembroke* were on the briefs for appellant.

*Michael R. Sherwin*, Acting United States Attorney at the time, *Channing D. Phillips*, Acting United States Attorney at the time of supplemental briefing, *Elizabeth Gabriel*, *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Elizabeth H. Danello*, and *Ellen D'Angelo*, Assistant United States Attorneys, for appellee.

Before EASTERLY and DEAHL, *Associate Judges*, and GLICKMAN,* *Senior Judge*.

Opinion of the court by *Associate Judge* DEAHL.

Opinion by *Senior Judge* GLICKMAN, dissenting in part, at page 43.

---

* Judge Glickman was an Associate Judge of the court at the time of submission. He began his service as a Senior Judge on December 21, 2022.

DEAHL, *Associate Judge*: Timothy Dugger was convicted of assault with intent to kill while armed and a dozen related charges after he shot his friend, Samuel Wright. Dugger claimed that he acted in self-defense after Wright shot at him first. While Dugger's direct appeal was pending, he filed a motion under D.C. Code § 23-110, arguing that he was deprived of his Sixth Amendment right to the effective assistance of counsel. The Superior Court denied that motion. The court concluded that counsel had not been deficient in some of the ways alleged, assumed that he had been in others, but ultimately concluded that Dugger could not show the requisite prejudice to entitle him to a new trial. Dugger now appeals that ruling. We reverse and vacate the majority of Dugger's convictions.

The performance of Dugger's now-disbarred trial counsel, Raleigh Bynum II, fell far below prevailing professional norms in many respects. From the beginning, Bynum lied to the court and to Dugger about his qualifications to take on the representation. The trial judge, before permitting Bynum to take over the representation from far more experienced counsel, pressed Bynum on his qualifications to defend against the serious charges. Bynum assured the court (and Dugger) that he had experience trying serious felonies, including assaults with intent to kill, when in fact all evidence indicates that Bynum had never appeared in court in a criminal case of any stripe. In fact, Bynum was in the midst of disciplinary

proceedings for similarly misrepresenting his qualifications to take on a medical malpractice case in South Carolina (where he was not barred), leading to his disbarment. During those disciplinary proceedings, and just one month before he began representing Dugger, Bynum admitted that he lacked the ability to take on any clients in any legal matter due to various medical issues.

Bynum's unfitness was, unsurprisingly, evident during Dugger's trial. While Dugger raises nearly a dozen largely substantiated deficiencies with Bynum's performance—ranging from Bynum's failure to even retrieve predecessor counsel's trial file to his decision not to retain an investigator—three deficiencies in particular stand out. First, Bynum elicited testimony during his cross-examination of a witness that Dugger was a drug dealer, and rather than moving to strike that testimony, he repeated and highlighted it for the jury. Contrary to the trial court's ruling, he had no conceivable strategic reason for that course of action. Second, Bynum failed to impeach Wright with any of his criminal convictions, including for the violent offense of second-degree assault and for drug possession. The government acknowledges these convictions were "favorable impeachment evidence" and does not dispute that Bynum was deficient for failing to put evidence of them before the jury. Third, Bynum did not object when the trial court instructed the jury, at the government's request, that it could consider the evidence of Wright's peaceful

character when assessing who was the first aggressor. As the government concedes, and as we previously determined in the direct appeal, no such evidence had been introduced and the instruction was erroneous.

But for the combination of these deficiencies, we conclude that there is a reasonable probability that the outcome of Dugger's trial would have been different, at least as to the lead counts against him. Where the defense was predicated on a theory that Wright shot at Dugger first, Bynum's deficiencies were prejudicial where he (1) highlighted evidence that his client was a drug dealer rather than striking it, (2) failed to introduce evidence of Wright's own violent and drug-related convictions, and (3) permitted the jury to be instructed about the non-existent evidence of Wright's peaceful character without objection. We therefore reverse the denial of Dugger's § 23-110 motion and vacate most of his convictions.

**I.**

Timothy Dugger was convicted of assault with intent to kill, or AWIK, while armed, and related offenses. Dugger shot his friend, Samuel Wright, though Dugger contended that he acted in self-defense after Wright shot at him first. For more than a year, Dugger was represented in the pretrial proceedings by an experienced defense attorney, Dana Page of the Public Defender Service. But as the expected trial date

approached, Page asked to withdraw her representation. She explained her understanding that Dugger wished to retain new counsel, Raleigh Bynum II.

*Bynum Takes Over the Representation Under False Pretenses*

The trial judge, the Hon. Lynn Leibovitz, was wary of the request to substitute counsel. Judge Leibovitz explained to Dugger that Page was "as good a lawyer as Mr. Dugger could ever have," whereas she had never even seen Bynum before despite having been a Superior Court judge for well over a decade. Judge Leibovitz asked Bynum whether he was a member of the District of Columbia Bar or if he had previously defended clients against charges as serious as Dugger's in any court. Bynum claimed that he had represented clients in Superior Court on "[v]arious— felonies, misdemeanors, drugs, assault," and that he had "done assaults with— assaults with intent to kill." When asked, Bynum struggled to name any Superior Court judge whom he had appeared before, and then pivoted to saying that he had "done stuff in the Federal Court" in the District, though he could not name a judge he had appeared before in federal court either. Bynum also clarified that he had never spoken with Dugger himself, but that Dugger's father had retained his services on his son's behalf.

Before permitting the substitution, Judge Leibovitz gave Bynum a chance to speak with Dugger while admonishing him to "be extremely candid with [Dugger] about the fact you haven't necessarily done an assault with intent to kill while armed case." Bynum retorted by again insisting that he had in fact represented a client against an AWIK charge, but simply could not say where he had done so without "look[ing] at [his] dossier." After speaking with Bynum privately, Dugger agreed to retain him, and Judge Leibovitz dismissed Page.

Only after trial did it become apparent that Bynum had never tried a criminal case. While Bynum suggested that he had tried criminal cases in the Superior Court and the federal District Court for the District of Columbia—the only jurisdiction where he was barred—independent searches of the relevant electronic databases by both a defense investigator and a deputy clerk in the Superior Court revealed no instance where Bynum was counsel of record in any criminal matter. Bynum also failed to mention to the trial court—and, it seems, to Dugger—that when he accepted the representation he was in the midst of serious disciplinary proceedings for misrepresenting his qualifications to take on another matter. *See In re Bynum*, 197 A.3d 1072, 1074-75 (D.C. 2018).[1] Those proceedings continued throughout

---

[1] Dugger highlighted Bynum's disciplinary proceedings in the § 23-110 hearings, noting that Bynum had been disbarred for "flagrant dishonesty" for

Dugger's trial and would ultimately lead to his disbarment for, among other things, "flagrant dishonesty." *Id.*

*Bynum's Contemporaneous Disciplinary Proceedings and Disbarment*

The misconduct that led to Bynum's disbarment bears a telling resemblance to how he came to represent Dugger in this case. In 2011, an incarcerated man named William Reid, Jr., on another inmate's recommendation, sought Bynum's representation in a South Carolina medical malpractice action against the hospital where Reid's wife died shortly after childbirth. *In re Bynum*, Board Docket No. 16-BD-029, *3, *5 (BPR Apr. 4, 2018). Reid had been represented by a different attorney in initiating that medical malpractice suit, but that counsel sought to withdraw his representation due to disagreements with Reid. *Id.* at *5. Bynum agreed to represent Reid after failing to inform him that he was not licensed to practice law in South Carolina and telling him, falsely, that he had experience litigating medical malpractice actions. *Id*. at *6. After securing the representation,

_____

conduct that closely resembled his conduct in this case. We have looked to the record in the disciplinary proceedings themselves in fleshing out some of the more granular points above, as we may "judicially notice proceedings in related cases." *See In re Marshall*, 549 A.2d 311, 313 (D.C. 1988) (citing *Coleman v. Burnett*, 477 F.2d 1187, 1198 (D.C. Cir. 1973)).

Bynum "did nothing to undertake discovery or [] litigate the case," and the South Carolina court dismissed Reid's suit for failure to prosecute in 2014 after concluding that Bynum had not "done anything to prosecute the case in the last two years." *Id.* at *8-9 & n.8.

In June of 2016, the District's Office of Disciplinary Counsel filed a litany of charges against Bynum in relation to Reid's case, including: failure to provide zealous and diligent representation, intentional failure to seek the lawful objectives of clients, and conduct involving dishonesty and misrepresentation. *In re Bynum*, Board Docket No. 16-BD-029, *4-5 (HC Rep. Apr. 27, 2017). A disciplinary hearing was held two months later, in August 2016. *Id.* at *5. Bynum asserted various illnesses as mitigation. He stated that, as a result of his illnesses, he was "heavily medicated and was unable to focus [or] concentrate," that "his practice was severely limited due to his inability to focus and lack of energy and drive to attend to clients," and "that he ha[d] not taken on new clients due to his illness."

Nonetheless, Bynum began representing Dugger less than two months later, in October 2016, assuring Dugger and Judge Leibovitz of his qualifications to do so. Several months after he began representing Dugger, but still two months before trial, a Hearing Committee considering the disciplinary charges found that the evidence

established that Bynum committed a variety of infractions and recommended that he be suspended from the practice of law for three years with a requirement that Bynum prove his fitness before reinstatement. *Id.* at \*62. Bynum did not contest that recommendation, though he made no mention of it to the trial court and proceeded to represent Dugger at trial two months later.

Disciplinary Counsel took exception to the Hearing Committee's recommendation, however, and in the midst of Dugger's trial it filed a brief with the Board on Professional Responsibility requesting that Bynum be disbarred. Again, Bynum made no mention of this to the trial court, nor apparently to Dugger. The Board agreed that Bynum should be disbarred and, the following year, we adopted the Board's recommendation and disbarred Bynum. *In re Bynum*, 197 A.3d at 1074-75.

*The Government's Evidence at Trial*

At Dugger's trial, the evidence showed that on the day of the shooting, Dugger drove his friend, Wright, and Wright's wife and son home. Because Dugger and Wright planned to go out for drinks, Dugger waited in the car while Wright escorted his family into their apartment. When Wright came back out of the apartment

building, Dugger shot him. The central issue at trial, presided over by the Hon. Judith Bartnoff, was whether (as Dugger contended) Wright shot at Dugger first.

Wright testified that when he exited his apartment building, Dugger was parked on the far side of the street and, with his arm extended out of the driver's side window, began firing at him without provocation. Wright claimed that he was unarmed and responded by running across the street toward the car, around the back of it, and trying to enter the car through its passenger's side in an effort to wrestle the gun away from Dugger. When Wright failed to disarm Dugger, Dugger made a U-turn and fired several more shots before driving away. Wright suffered two gunshot wounds, causing injuries to his back, chest, and right arm. As for Dugger's motive, the government theorized that Dugger shot Wright because he suspected Wright of having an affair with Dugger's fiancée, Angel Wiggins. The government introduced text messages that Dugger sent to Wiggins prior to the shooting, accusing her of cheating on him, and a petition for a civil protection order that Wiggins had filed against Dugger just three days before he shot Wright.

In addition to Wright, the government called two witnesses who testified that they saw the end of the shooting, though they did not claim to see who fired the initial shots. A hearing-impaired neighbor, Anthony Napier, felt the vibrations of

the first round of gunshots from his nearby apartment, though he did not see who fired them. Napier went to the window to investigate and saw Wright "teetering back and forth" as if trying to dodge something as Dugger made a U-turn, and Napier again felt the vibrations of subsequent gunshots. Napier said that Wright appeared to be unarmed. A police officer, James Huff, was also in the area and heard the initial gunshots, but did not see who fired them. When Officer Huff arrived on the scene, he saw Dugger make a U-turn and fire shots at Wright. Like Napier, Officer Huff also thought Wright appeared to be trying to dodge gunfire. As Dugger fled, Officer Huff gave chase on his motorcycle. Eventually, Dugger lost control of his vehicle, crashed, and attempted to flee on foot, though officers apprehended him. Officers recovered a 9-millimeter handgun and its magazine along his flight path. Uncontested forensic evidence established that Dugger's thumbprint was on the gun's magazine.

The government also called Mark Vanderhall, an inmate who shared a cell with Dugger for three days after he was arrested in this case. Vanderhall had a long criminal history and had routinely cooperated with the government—six times by his count—often in exchange for lighter sentences for his own offenses. Vanderhall testified that he knew Dugger from the neighborhood for years before they briefly shared a cell together. He claimed that Dugger confessed to shooting Wright and

throwing a 9-millimeter gun out of the car window as he fled. According to Vanderhall, Dugger mentioned that he believed that Wiggins was "messing with" Wright.

*Bynum's Performance at Trial*

Dugger testified in his own defense. He explained that he and Wright were like "best friends" for about twenty years. Two weeks before the shooting, an unknown person shot at Dugger outside of his parents' home, putting him on edge. Because of that incident, Dugger purchased a gun to protect himself. Wright then mentioned to Dugger that "he had laid some shots at somebody that he didn't like," which Dugger suspected was a veiled admission that Wright was the person who had shot at him. On the day of the shooting, Dugger dropped off Wright and his family at their apartment. Wright then came out of the building and, as he was crossing the street and within about 10-15 feet of Dugger's car, pulled out a revolver and fired two shots at Dugger before the gun jammed. Dugger explained that, in a state of panic, he fired back at Wright and then made a U-turn and drove off.

Aside from Dugger's own testimony, Bynum did little to bolster the claim of self-defense, despite clear opportunities to do so. While Wright testified, and thereby left himself open to impeachment with certain prior convictions, Bynum did

not attempt to introduce Wright's Maryland convictions for second-degree assault or possession of narcotics (non-marijuana). Bynum did attempt to introduce Wright's past conviction for misdemeanor destruction of property during the cross-examination of a different witness, though the trial court precluded him from doing so.

Bynum also affirmatively undermined Dugger's defense in powerful ways. In cross-examining Vanderhall, for instance, Bynum asked several dozen questions probing the extent to which he and Dugger were friends before their brief stint as cellmates. Vanderhall offered that they were good friends and saw each other "every day . . . for three or four years" in their shared neighborhood. Bynum continued to press Vanderhall about the nature of their interactions, despite the obvious peril that Vanderhall might reveal that Dugger—who had previously been convicted of possession with intent to distribute a controlled substance—was once a drug dealer. Eventually, when Bynum asked, "[W]hen you say you would see him every day . . . it wasn't like you actually were hanging?" Vanderhall responded, "I was on drugs back then. [Dugger] sold drugs." Bynum, seemingly caught unawares, repeated, "Oh, he sold drugs then," to which Vanderhall replied, "Yeah."

When it came time for jury instructions, the government requested that the court instruct the jury that it had heard evidence of Wright's peaceful character, which it could consider in assessing who was the first aggressor. There was no such evidence—as we noted in Dugger's direct appeal, "the jury heard evidence to the contrary, including from Wright himself," such as when Wright testified about his "tendency to put [his] hands on people." Yet Bynum did not object when the court instructed the jurors that they had "heard evidence about the peaceful character of Samuel Wright" and that they "may consider such evidence only as bearing on the likelihood that Samuel Wright threatened Timothy Dugger with imminent bodily harm; that is, on the issue of who was the aggressor." In fact, Bynum stated that the "[d]efense has no issue with that" instruction.

The jury found Dugger guilty on all counts, and the trial court sentenced him to fourteen years of imprisonment. We affirmed Dugger's convictions on direct appeal. *Dugger v. United States*, 17-CF-1035, Mem. Op. & J. (D.C. June 30, 2020) ("*Dugger I*"). During the pendency of Dugger's direct appeal, he filed the instant § 23-110 motion.

*The Post-Trial Proceedings*

Dugger filed a § 23-110 motion arguing that Bynum had rendered ineffective assistance of counsel. First, Dugger pointed to three aspects of Bynum's pretrial conduct that he argued were deficient: (1) Bynum had misrepresented his qualifications to take on the matter; (2) Bynum never retrieved Page's trial file despite her year's worth of preparation in the case; and (3) Bynum never retained an investigator to work on the case, nor did it appear that Bynum had done any investigation of his own. Dugger also claimed that Bynum was deficient in his trial performance when he, among other things: (4) allowed testimony that Dugger was once a drug dealer to be introduced without objection; (5) failed to impeach Wright with any of his several past convictions, including convictions for second-degree assault and drug possession; and (6) failed to object to the erroneous instruction telling jurors they could consider non-existent evidence of Wright's peaceful character in assessing who was the first aggressor.

Judge Bartnoff, who remained on the case during post-trial proceedings, held an evidentiary hearing on the § 23-110 motion, though no party called Bynum as a

witness.[2]  Two witnesses testified on Dugger's behalf.  First, a defense investigator testified that he could find no record of Bynum having ever appeared in a criminal case in D.C. Superior Court,[3] despite running multiple searches including a number anticipating potential misspellings of Bynum's name.  The government had already stipulated that there was "no record of [Bynum] practicing in Federal Court in D.C."  Second, an experienced defense attorney who had tried more than 50 criminal cases, Jenifer Wicks, testified.  She explained the professional norms relating to each of the six alleged deficiencies outlined in the prior paragraph—save for the fourth, which she was not asked about.  While the court precluded her from offering an ultimate opinion on the matter, the court accurately described it as "self evident" from her testimony that she believed Bynum's conduct fell below the norms she had described as to each alleged deficiency.  Dugger also submitted an affidavit from his predecessor counsel, Dana Page.  Page explained her extensive efforts to hand her trial file off to Bynum, including contacting Judge Leibovitz to explain that Bynum had not retrieved it, prompting a hearing the month after Bynum began his

---

[2] The government told the court: "[W]e are not planning to put on any witnesses. . . . [W]e were not preparing to call Mr. Bynum."

[3] The government likewise had a deputy clerk in the Superior Court search the court's records and could find no record of Bynum having ever appeared in a criminal case in Superior Court.  Even still, the government maintained that the Superior Court's records may have been incomplete.

representation where Page explained to him that it was waiting for him just a block away from the courthouse. Yet Bynum still never retrieved the file.

The trial court denied the § 23-110 motion. As to the six deficiencies outlined above, the court reasoned, in turn: (1) that while it "in no way condone[d] any misstatements by Bynum with regard to his experience or anything else," "even accepting that Mr. Bynum misstated or exaggerated his experience, it [wa]s not at all clear that such conduct necessarily related to any aspect of [his] performance at trial"; (2) it acknowledged that "it presumably would have been prudent for Mr. Bynum to obtain Ms. Page's [trial] file," but it could not conclude his failure to do so "in and of itself constituted deficient performance"; and (3) it recognized "that it generally is prudent for defense counsel to hire an investigator, but there is no explicit requirement in *Strickland* for counsel to do so." As for Bynum's alleged trial deficiencies, as relevant here, the court: (4) found that Dugger had "not shown that [Bynum's] failure to move to strike" Vanderhall's testimony that Dugger was a drug dealer "was anything other than a strategic choice"; (5) assumed that Bynum was deficient for failing to impeach Wright with his prior convictions, but concluded that Dugger could not show the result of the trial would have been any different but for that deficiency; and (6) assumed that Bynum was deficient for failing to object

to instructing the jury about Wright's "peaceful character," but again found that deficiency did not prejudice Dugger.

Dugger now appeals the denial of his § 23-110 motion.

## II.

On appeal, Dugger argues that Bynum provided constitutionally ineffective assistance of counsel. We agree.

The Sixth Amendment guarantees the right to effective assistance of counsel. U.S. Const. amend. VI; *see Strickland v. Washington*, 466 U.S. 668, 684-86 (1984). Effective assistance is "the means through which the other rights of the person on trial are secured." *United States v. Cronic*, 466 U.S. 648, 653 (1984). In *Strickland*, the Supreme Court explained that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686.

An ineffective assistance claim has two prongs. The first is the deficiency prong, which requires the defendant to show that "counsel made errors so serious

that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Counsel's performance is deficient if it "fell below an objective standard of reasonableness." *Id.* at 688. The second is the prejudice prong, which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. In other words, to demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Both prongs of an ineffective assistance claim are mixed questions of law and fact. *Id.* at 698; *see also Cosio v. United States*, 927 A.2d 1106, 1123 (D.C. 2007) (en banc). While we defer to the trial court's factual determinations unless they are unsupported by the record, its ultimate deficiency and prejudice determinations are legal in nature and are reviewed de novo. *Id.* "To determine whether reversal is warranted" where there are multiple alleged deficiencies, we evaluate whether the "cumulative impact" of the deficiencies prejudiced the defendant. *See Gardner v. United States*, 140 A.3d 1172, 1197 n.38 (D.C. 2016).

**A.**

Before we address the deficiencies in Bynum's trial performance, we consider Bynum's pretrial conduct, which Dugger argues infected the entire representation and amounted to a type of structural ineffectiveness. The argument is not without force, particularly as to Bynum's blatant misrepresentations regarding his basic qualifications to represent Dugger.

In denying Dugger's § 23-110 motion, the trial court "accept[ed]," seemingly arguendo, "that Mr. Bynum misstated or exaggerated his experience." To the extent that falls short of a finding that Bynum misrepresented his qualifications to the court and Dugger, in our view the record evidence allows for but one conclusion: He did. Bynum told the court that he had handled "various . . . felonies" in Superior Court, including "assaults with intent to kill." When he could not name what judge he had appeared before when doing so, he pivoted to having "done stuff in the Federal Court." Two comprehensive record searches—one by a defense investigator and one by a deputy clerk of the Superior Court at the government's behest—both turned up zero instances of Bynum having ever filed an appearance in a criminal case in the District, the only jurisdiction where he claimed to have handled such a case and the only jurisdiction where he was barred. The government had the opportunity to call

Bynum as a witness if it thought he could provide any contrary evidence of an instance where he had previously appeared in court in a criminal matter, or it could have informally asked him to identify such a case and introduced independent evidence of his representation (a docket sheet, for instance) if any existed. It did not do so. There was thus no evidence at the § 23-110 hearing that Bynum had ever previously appeared in a criminal matter, leaving unrebutted the strong evidence that he had never done so.

While the trial court intimated that we do not know that Bynum similarly misrepresented his qualifications to Dugger, respectfully, we do. Dugger had never previously spoken to Bynum and was present as Bynum misrepresented his qualifications in open court. Those misrepresentations were not just to the trial court, but to Dugger himself. The notion that Bynum might then have confided in Dugger that he had committed a blatant fraud on the court in misrepresenting his qualifications—absent any evidence to that effect—is beyond far-fetched; it is preposterous. Couple all of that with the fact that Bynum was in the midst of disbarment proceedings for his "flagrant dishonesty" to another client, similarly misrepresenting his qualifications represent them in a matter, and we think the inescapable conclusion is that Bynum lied to the court and Dugger about his basic qualifications to represent Dugger in this case.

In some limited scenarios, courts have found that gross misrepresentations about one's basic competence to handle a criminal matter amount to ineffectiveness per se. *See, e.g.*, *United States v. Novak*, 903 F.2d 883, 887-90 (2d Cir. 1990) (counsel who gained admission to bar by fraudulent means was per se ineffective); *United States v. Bergman*, 599 F.3d 1142, 1148 (10th Cir. 2010) (adopting a "per se rule of ineffectiveness where a defendant is, unbeknownst to him, represented by someone who has not been admitted to any bar based on his 'failure to ever meet the substantive requirements for the practice of law'"); *United States v. Mouzin*, 785 F.2d 682, 697 (9th Cir. 1986) ("A defendant's right to effective assistance of counsel would be violated where he is represented by a person posing as a lawyer who had not been admitted to any bar."). Notably, though, each of those cases involved an attorney who had not been "duly admitted" to the bar where they were practicing, whereas here, there is no contention that Bynum was not duly admitted to the District's Bar, only that he had otherwise misrepresented his qualifications while in the midst of disciplinary proceedings for similar misrepresentations. *See United States v. Mitchell*, 216 F.3d 1126, 1133 (D.C. Cir. 2000) ("Instead of extending a per se rule to cover various states of attorney licensure, courts have considered the facts of the cases to determine if counsel was ineffective.").

This court has never confronted what approach to adopt in this scenario.  We might (1) adopt a rule of per se ineffectiveness for gross misrepresentations of counsel's core competence to handle a matter, (2) adhere to a typical *Strickland* analysis, including the presumption that trial counsel's decisions were part of a sound strategy, or (3) tread some middle path where we apply a modified *Strickland* analysis, stripped it of any presumption that counsel acted strategically.  Without foreclosing the first route in a future case, we take the third path here, as we conclude that Bynum's misrepresentations and pretrial conduct were such gross deviations from professional norms to at least dispel any presumption that his trial conduct was the result of sound trial strategy.  The D.C. Circuit reached similar conclusions in *United States v. Butler*, 504 F.2d 220 (D.C. Cir. 1974), a pre-*Strickland* case that remains persuasive.

In *Butler*, the court rejected any rule that counsel was per se ineffective by virtue of "misrepresent[ing] his membership in the [local] bar to the court . . . and to his clients."[4]  *Id.* at 224.  But it found on the facts of the case that counsel was

---

[4] In *Ransom v. United States*, we adopted *Butler*'s rejection of any per se ineffectiveness rule for counsel who was not a member of the local bar (but was barred elsewhere).  947 A.2d 1127, 1129 & n.4 (D.C. 2008).  We distinguished *Butler* on its facts, because, unlike here, there was not even an allegation "that counsel had no [] relevant trial experience."  *Id.*  Indeed, we found that Ransom's counsel "was qualified in every respect" other than his failure to file a specific form

ineffective where he "apparently had no previous trial experience" and where "the record of the trial itself reveal[ed] significant errors on the part of counsel." *Id.* Though the trial errors "may arguably [have] be[en] the product of tactical decisions"—which are not typically "germane to an ineffectiveness claim"—they were nevertheless "highly relevant where . . . other factors . . . independently raise[d] the question of ineffectiveness." *Id.* In other words, *Butler* adopted the view that counsel's serious dishonesty and lack of qualifications to undertake a representation may serve as a sort of wholesale rebuttal that their trial conduct was "the product of tactical decisions as opposed to being the result of inadequate preparation." *Id.*[5]

We agree with that approach, and think it is more sensible than entirely discounting Bynum's gross misrepresentations about his core qualifications as

---

stating that he was a nonmember of the D.C. Bar being supervised by a D.C. attorney. *Id.*

[5] *Cf. Waterhouse v. Rodriguez*, 848 F.2d 375, 383 (2d Cir. 1988) ("[S]omeone insensitive to the duty not to undertake representation in a criminal proceeding without a license is hardly likely to be more sensitive to his or her duty of undivided loyalty to the client."); *People v. Atkinson*, 786 N.Y.S.2d 690, 695 (N.Y. Sup. Ct. 2004) ("[T]he conduct of a lawyer who has been suspended should be scrutinized very carefully."); *Massachusetts v. Thibeault*, 556 N.E.2d 403, 407 (Mass. Ct. App. 1990) ("[S]crutiny should be particularly careful and discriminating where the attorney at the time was under suspension or other bar from practice" because "sound representation comprises not only legal proficiency on the part of the advocate but fidelity to ethical standards.").

simply irrelevant to the *Strickland* analysis, as the trial court seemed to do. Bynum's pretrial conduct—(1) misrepresenting his core qualifications to the trial court and his client, (2) failing to even retrieve predecessor counsel's trial file, and (3) failing to retain a defense investigator—closely resembles the type of unprofessional conduct that *Butler* reasoned should undercut any notion that counsel otherwise acted tactically. *See Butler*, 504 F.2d at 224. Here, too, Bynum's pretrial conduct fell so far below professional norms, and he so blatantly lied about his core qualifications to take on this representation,[6] that the presumption that he otherwise acted strategically throughout trial is simply not warranted. Put another way, the presumption has been rebutted wholesale. That conclusion is bolstered by the fact that Bynum was in the midst of disciplinary proceedings stemming from similar misrepresentations in another case—in which he caused his civil client's suit to be dismissed for want of prosecution through his clearly non-strategic inaction—leading to his disbarment.

---

[6] We stress Bynum's misrepresentations because a defendant who knowingly engages unqualified defense counsel would likely forfeit their right to complain about that informed choice (though they might have more pointed complaints about their counsel's conduct). In any event, the presumption that defense counsel has engaged in sound trial strategy could only arguably apply to one of the alleged deficiencies here—Bynum's failure to move to strike testimony that Dugger was a drug dealer. We doubt this could be deemed sound trial strategy even if we applied the ordinary presumption that it was, for reasons explained further below.

**B.**

We now turn to the alleged deficiencies with Bynum's trial performance and their prejudicial effect on Dugger's trial. While many of the alleged deficiencies concern us, we focus on three in particular that are sufficient to resolve this case: (1) Bynum did not move to strike Vanderhall's testimony that Dugger was a drug dealer, but instead highlighted it; (2) Bynum failed to impeach Wright with any of his numerous prior convictions; and (3) Bynum failed to object to instructing jurors, counterfactually, that they had heard evidence of Wright's peaceful character and could consider that evidence in determining who was the first aggressor. Together, each of these deficiencies contributed to a narrative that Dugger was a violent drug dealer and Wright a peaceful man, a narrative that substantially undercut the entire defense theory that Wright was the first aggressor. We address each deficiency, and its corresponding effect on the trial, in turn, before considering their cumulative effects on the trial.

*1. Failing to Strike and Highlighting Evidence that Dugger Was a Drug Dealer*

Dugger was convicted of possession with intent to distribute a controlled substance in 2009, several years before the shooting at issue here. While the government never sought to admit evidence of that conviction in its own case,

Bynum—seemingly inadvertently, and apparently unaware of his own client's prior conviction—introduced evidence of Dugger's past drug dealing when he cross-examined Vanderhall, the jailhouse informant to whom Dugger supposedly confessed. Vanderhall testified that he first met Dugger in 2004 and would see him "every day or every other day" for about "three or four years" (i.e., until around the time when Dugger was arrested on the distribution charge). Despite the obviously treacherous territory he was wading into, Bynum asked Vanderhall more than two dozen questions—spanning five pages of transcripts—about the extent and nature of his interactions with Bynum. Vanderhall was initially fairly opaque in his answers. When Bynum asked him "in what regard" he saw Dugger nearly every day, Vanderhall answered, "In the neighborhood." When Bynum asked if they had "any deep conversation[s] about anything," Vanderhall answered, "probably." When Bynum asked what those conversations were about, Vanderhall answered, "Just neighborhood stuff, you know."

Bynum would not relent and eventually posited that "it wasn't like you actually were hanging," and Vanderhall answered: "Yeah. See, I was on drugs back then. He sold drugs." Bynum, seemingly caught unawares, responded: "Oh, he sold drugs then[?]" Vanderhall replied, "Yeah," to which Bynum said, "Oh, okay."

Bynum's failure to move to strike this testimony, coupled with his own highlighting of it, was deficient performance. The government does not dispute that a motion to strike would have been successful. It instead echoes the trial court's reasoning that Dugger had "not shown that his counsel's failure to move to strike that response was anything other than a strategic choice not to highlight or lend credence to that information and not to appear to be seeking to keep information from the jury." We are not persuaded.

Assuming that (1) this was a nonresponsive answer that (2) Bynum could have successfully moved to strike—points the parties do not dispute[7]—the trial court's

---

[7] We doubt both of those points, though we proceed based on the parties' shared view of them. In fact, Vanderhall's answer was perfectly responsive to the repeated questions about how he came to know Dugger, so it is unlikely that Bynum could have successfully moved to strike the testimony. *See Gonzalez v. United States*, 697 A.2d 819, 826 (D.C. 1997). But the government does not offer that defense of the charged "failure to move to strike" deficiency, no doubt because to do so only makes Bynum's deficiency much clearer. Bynum steered heedlessly into dangerous territory when he questioned Vanderhall at length about the nature of his neighborhood interactions with Dugger, despite Vanderhall's initial opaqueness that their interactions were just "neighborhood stuff." Bynum should have known in advance how Vanderhall and Dugger knew one another and tailored his questioning to avoid the very testimony he elicited. Bynum's seeming surprise at Vanderhall's answer—"Oh, he sold drugs then[?]"—reveals that he was caught unawares by his own client's drug dealing. No competent attorney would have been. Our dissenting colleague would find that there was no deficiency here on a basis that the government does not advance: that Bynum elicited this testimony and so could not have successfully moved to strike it. If we were to follow the dissent's approach of overlooking the government's failure to make that argument, then we should

finding that this was a strategic choice does not withstand scrutiny. As explained above, the presumption that Bynum was acting strategically is not warranted in light of Bynum's lack of qualifications to handle this matter and his misrepresentations about the same. And even if that presumption could survive those core deficiencies, "the mere incantation of 'strategy' does not insulate . . . from review" a decision that no reasonable attorney would make. *Brecheen v. Reynolds*, 41 F.3d 1343, 1369 (10th Cir. 1994).

Bynum's failure to move to strike the testimony cannot be chalked up to a desire not to highlight it when, in fact, Bynum did highlight it by repeating it. While defense counsel might in some instances strategically choose to let a "fleeting reference" to criminal conduct go unchallenged, rather than risk drawing attention to it, *Harris v. United States*, 366 A.2d 461, 464 n.7 (D.C. 1976),[8] that justification

---

likewise forgive Dugger's failure to frame this claim as a deficiency in the elicitation of this testimony. And if it were framed that way, we would hold that Bynum was deficient in eliciting the testimony.

[8] There is no general rule that it is always within the realm of reasonable strategy not to seek to strike references to such criminal conduct, and the trial court's incantation of "strategy" as to this charge was devoid of any consideration of whether the strategy was reasonable on the facts here. It would be one thing if Bynum forwent a curative jury instruction that would draw the jury's attention back to damaging testimony that occurred some hours or days earlier in the trial, where it would be readily apparent why counsel might want to avoid reminding the jury of distant testimony. *See Atkinson v. United States*, 121 A.3d 780, 789-90 (D.C. 2015).

loses all force when defense counsel repeats it, as if surprised by the revelation that his client dealt drugs despite a criminal record that should have alerted him to that history.

While the government tries to discount the prejudicial effect of this testimony as "completely unrelated" to the AWIK charge, that description is inapt. "[A]s has been often observed, drugs and weapons go together." *Peay v. United States*, 597 A.2d 1318, 1321 (D.C. 1991) (en banc); *see also Irick v. United States*, 565 A.2d 26, 31 (D.C. 1989) (quoting expert testimony that "when you relate to drugs and guns it's like a marriage"). Part of Dugger's defense was that he had only acquired a firearm after somebody had shot at him about two weeks before the shooting here, and then only used the firearm after Wright shot at him first. That account became considerably less plausible once the jury learned that Dugger was a drug dealer, given the close association between drug dealers, guns, and violence. *See United States v. Payne*, 805 F.2d 1062, 1065 (D.C. Cir. 1986) ("[I]t has uniformly been

---

It is more difficult to understand why counsel would strategically forgo an immediate motion to strike testimony like this, where there is an "almost invariable assumption" that jurors can and will follow instructions that are "prompt, complete, persuasive, and to the point." *Id.* at 789 (citations omitted). And the only conceivable justification for such a strategic choice—to avoid highlighting the testimony—is not viable here, in light of the fact that Bynum then repeated the damaging testimony.

recognized that substantial dealers in narcotics possess firearms and that such weapons are as much tools of the trade as more commonly recognized drug paraphernalia.").

## 2. *Failure to Impeach Wright with His Prior Convictions*

We next consider, in juxtaposition to Bynum highlighting his own client's criminal past, Bynum's failure to impeach Wright with any of his own prior convictions. Putting aside Bynum's unsuccessful attempt to introduce Wright's conviction for misdemeanor destruction of property, he did not even attempt to introduce Wright's convictions for second-degree assault or for possession of a non-marijuana controlled substance.

Neither the government nor the trial court dispute Dugger's claim that Bynum's failure to impeach Wright with these convictions constituted deficient performance. Instead, they both reason that this failure did not prejudice Dugger.[9] While we might therefore treat deficiency as a conceded point, we nonetheless pause

---

[9] The trial court seemed to think that Wright had also been convicted of "carrying a dangerous weapon, armed robbery, attempted possession with intent to distribute ecstasy, and grand larceny." Those were actually Vanderhall's convictions.

on the deficiency prong of the analysis because there is one aspect of it that we are compelled to elaborate on. It is not entirely clear if Bynum was in fact aware of Wright's prior convictions—as we noted in the direct appeal, there is reason to doubt that the government disclosed Wright's convictions, save for the destruction of property conviction that Bynum tried to introduce at one point. That potential failure to disclose underlies Dugger's *Brady* claim, *see Brady v. Maryland*, 373 U.S. 83 (1963), which he included in his § 23-110 motion and now reiterates on appeal, though we do not reach that claim.

Ultimately, it is really of no moment whether Bynum was aware of these convictions. There are two possibilities, and both lead to the same result. Bynum either knew about Wright's convictions, in which case he was deficient for failing to introduce them. *See Grant v. Lockett*, 709 F.3d 224, 234 (3d Cir. 2013) (abrogated on other grounds) ("A key prosecution witness's prior criminal history . . . clearly constitute[s] important impeachment evidence. It is beyond the range of professionally reasonable judgment to forego investigation of, and impeachment based upon, such evidence absent some apparent strategic reason that might explain or excuse counsel's failure.") This was not a matter of cumulatively adding minor convictions on top of more serious ones that had already been introduced, but a matter of doing the bare minimum to alert the jury to Wright's violent criminal past.

The alternative is that Bynum did not know about these convictions, in which case he was deficient in failing to discover them because, as the government points out, a simple search of Maryland judiciary's publicly accessible website would have revealed them. Competent defense counsel, in a case of this magnitude when claiming self-defense, would run at least a rudimentary criminal history check on the complainant and lead government witness, particularly one with an admitted "tendency to put [his] hands on people." *See Cosio*, 927 A.2d at 1128 ("[W]e have no doubt that any competent defense attorney would have appreciated the need to investigate [the complainant's credibility]."); *Kigozi v. United States*, 55 A.3d 643, 655 (D.C. 2012) ("[I]t cannot be gainsaid that credible evidence impeaching the government's key witness is an elementary component of a proper defense."); *see also Grant* 709 F.3d at 234 ("A key prosecution witness's prior criminal history . . . clearly constitute[s] important impeachment evidence" that it is deficient not to investigate). If Bynum failed to do such a barebones investigation into Wright's past—recall that he did not retain an investigator—he was deficient in his investigation.[10]

---

[10] Even if one were to conclude that a failure to uncover these convictions was not deficient because defense counsel might reasonably rely on the government to disclose its witnesses' past convictions, that would not materially change our analysis. The government does not dispute that it had an obligation to disclose these convictions under *Brady*. Its responses to Dugger's *Brady* claim are that (1) the government did in fact disclose them, and (2) even if it did not, the convictions were

As for prejudice, we disagree with the Superior Court's suggestion that raising Wright's convictions only stood to inflict "minimal incremental damage to [his] credibility." Bynum had recklessly introduced evidence of his own client's criminal past and then inexplicably failed to introduce evidence of Wright's violent and criminal past. In a case where the central question was who was the first aggressor— and no witness saw who fired the initial shots except for Dugger and Wright, each of whom pointed the finger at the other in their testimony—failing to introduce evidence of Wright's violent criminal past, even if only as impeachment,[11] seriously undermined the defense.

---

not "material." If Bynum was unaware of these convictions that eliminates the first possibility, that the government in fact disclosed them. That leaves only an assessment of *Brady*'s materiality prong, which is in all relevant respects identical to *Strickland*'s prejudice prong, asking whether there is a "reasonable probability that . . . the result of the proceeding would have been different" but for the transgression. *United States v. Bagley*, 473 U.S. 667, 682 (1985) (adopting the *Strickland* prejudice standard for *Brady* materiality). Thus, if Bynum did not know about and was not deficient for failing to discover these convictions, we would be in the same position of assessing the harm from their omission, only via a *Brady* analysis.

[11] Wright's prior convictions would have been admissible only for impeachment purposes, not to show his violent propensities. *See Harris v. United States*, 618 A.2d 140, 144 (D.C. 1992) ("The rule in this jurisdiction is that only in homicide cases may prior violent acts of the victim be introduced as evidence to prove that the victim was the first aggressor."). But it would have been difficult for a jury to separate the proper from the improper use of this evidence, where an assessment of Wright's veracity boiled down to an assessment of whether the jury believed his claim that he was not the first aggressor. The two uses of the evidence thus have a tendency to collapse into each other, and impeachment evidence could

*3. Failure to Object to Erroneous Instruction on Wright's Peaceful Character*

Bynum also failed to object to the court erroneously instructing the jury that the government presented evidence of Wright's peaceful character. The government requested that the trial court instruct the jury that they had heard evidence of Wright's peaceful character and that it could consider such evidence "as bearing on . . . the issue of who was the aggressor," i.e., the central issue in the case. In fact there was no evidence that Wright had a peaceful character, yet Bynum said the "[d]efense has no issue with" the requested instruction.

Neither the government nor the trial court dispute that Bynum was deficient in this respect. Instead, they both contend that the erroneous instruction was not prejudicial because it was only a brief and general statement and we usually assume

---

easily—even if improperly—affect jurors' opinions about Wright's propensity for violence. *See, e.g.*, Ric Simmons, *An Empirical Study of Rule 609 and Suggestions for Practical Reform*, 59 B.C. L. Rev. 993, 994, 1013 (2018) (noting the widespread scholarly critiques of admitting prior convictions for impeachment purposes with "by far the strongest" critique being that jurors will use prior convictions for an "improper purpose"); Richard D. Friedman, *Character Impeachment Evidence: Psycho-Bayesian (!?) Analysis and a Proposed Overhaul*, 38 UCLA L. Rev. 637 (1991). Even presuming that the jury could have confined its consideration of these convictions to its pure impeachment value, impeaching Wright would have made serious inroads against the government's case, which depended predominantly on Wright's testimony.

that jurors do not consider non-existent evidence in their decision-making. While that is the usual assumption, *see Garcia v. United States*, 848 A.2d 600, 602-03 (D.C. 2004), there is a countervailing assumption that jurors follow the court's instructions and will give "great weight" to a judge's "lightest word or intimation." *Headspeth v. United States*, 86 A.3d 559, 564 n.7 (D.C. 2014) (quoting *Watkins v. United States*, 379 A.2d 703, 705 (D.C. 1977)); *see also Starr v. United States*, 153 U.S. 614, 626 (1894) ("Deductions and theories not warranted by the evidence should be studiously avoided. They can hardly fail to mislead the jury and work injustice." (citation omitted)). When those two assumptions point in contrary directions, as they do here, the latter is probably the dominant of the two, and at the very least it offsets the former so that it is no longer warranted.

Still, the government emphasizes that it did not capitalize on the instruction in its closing arguments and that Wright himself acknowledged some violent tendencies. And the trial judge also instructed the jury that it had "heard evidence about past acts of violence by" both Wright and Dugger, as bearing on the reasonability of any fear that Dugger harbored (which was not the subject of any serious dispute, as the reasonability of his fear rose and fell with whether Wright shot first). But that does not entirely mitigate the potential harm from the erroneous peaceful character instruction. One can have a generally peaceful character despite

having engaged in some past act of violence: the judge's two instructions were not contradictory. The jury thus still could have been swayed by the implication that it had evidence before it that Wright was generally peaceful, particularly given trial judges' unique position of authority vis-à-vis jurors. *Headspeth*, 86 A.3d at 564 n.7.

Even still, the government argues that Dugger was not prejudiced because, in *Dugger I*, we "soundly rejected [Dugger's] assertion that the peaceful-character instruction prejudiced his defense." That is not quite right. In *Dugger I* we held that the trial court's error in issuing the peaceful character instruction did not constitute plain error. *See Dugger I*, Mem. Op. & J. at 8-9. In addition to prejudice, plain error requires a separate showing that manifest injustice resulted from the error. *See Comford v. United States*, 947 A.2d 1181, 1189-90 (D.C. 2008). Also, in *Dugger I*, we considered the erroneous instruction's prejudicial impact sans any consideration of the impact of the other deficiencies articulated above (which were not at issue in *Dugger I*), whereas here we must consider the cumulative impact of Bynum's many deficiencies. To be sure, this error, standing alone, would not sufficiently prejudice Dugger to warrant vacatur of his convictions. But we are required to assess whether Bynum's various deficiencies, in the aggregate, prejudiced Dugger. *See Gardner*, 140 A.3d at 1197 n.38 (assessing the "cumulative effect" of alleged deficiencies). We now turn to that assessment.

## C.

While we have explained how each of the above deficiencies hampered the defense in isolation, we now examine whether they were prejudicial in combination. In considering the cumulative impact of these deficiencies, we ask whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Cosio*, 927 A.2d at 1132.

The trial turned on whether Wright or Dugger was the first aggressor. Each of Bynum's deficiencies contributed to the government's core narrative that Dugger was the initial aggressor. Because of Bynum's errors, the jury found out that Dugger was a drug dealer, with the corresponding inference that he was the type of person who would carry a gun for a violent purpose.[12] By contrast, the jury never found out that Wright had been convicted of a violent assault and possession of a non-marijuana substance; instead, as far as the jury knew, Wright had no criminal record. And the jury was told by the court, counterfactually, that it had heard evidence about

---

[12] The dissent suggests this testimony was not so damaging because it was undisputed that Dugger had a gun and, in fact, shot Wright. But there is a world of difference between somebody who carries a gun to facilitate the oft-violent drug trade—the narrative Bynum fed into when he elicited and failed to strike this testimony—and somebody who procures a gun for use in self-defense after having been shot at, as Dugger claimed.

Wright's peaceful character that it could consider when determining the central issue in the case, of who was the first aggressor. Together, the deficiencies contributed to a picture of Dugger as the dangerous criminal and Wright as the law-abiding and peaceful victim. We thus conclude that, but for Bynum's errors, there is a reasonable probability the outcome of the trial would have been different.

While the government admittedly had a fairly strong case against Dugger,[13] it was no slam dunk. Wright's testimony was the cornerstone of its case, and he was

---

[13] In *Dugger I*, we highlighted the most salient strengths of the government's case:

> (1) Napier and Huff confirmed that Wright was unarmed and that, after the initial shooting, appellant turned and drove back in order to shoot at Wright a second time; (2) there was no bullet damage to appellant's car (despite his claim that Wright fired twice at him); (3) appellant's flight in a high-speed chase, attempted abandonment of his gun, and efforts to avoid and resist arrest bespoke his consciousness of guilt; (4) Vanderhall testified that appellant confessed to him in jail, and this testimony was substantiated by the specific details Vanderhall said appellant had shared with him (such as appellant's motive and his disposal of a 9 millimeter handgun during the police chase); (5) appellant's alleged motive for shooting Wright—his belief that Wright had been sleeping with Wiggins—was proved by abundant evidence, including appellant's own admission.

*Dugger I*, Mem. Op. & J. at 7-8. That is a fair description of the evidence, though we clarify it in two respects. First, while there was abundant evidence that Dugger

not what anybody would call an unimpeachable witness. There were reasons to doubt his testimony. For instance, Wright testified that, after Dugger opened fire, he ran straight toward Dugger's car, around the back of it, and then tried to enter it because his "man instincts" were to "put some blood up in that damn seat." A jury might have reasonably doubted that account, as the more natural response to being shot at would seem to be seeking cover, or retreating back inside the nearby apartment that Wright had just exited, rather than running headlong at the gunman. In particular, if we add the fact that Wright had previous convictions for a violent assault[14] and a drug offense, and remove the implication that there was evidence he had a peaceful character and that Dugger was a drug dealer, then Wright's version

---

suspected Wiggins of having an affair, at no point did he admit to suspecting that it was with Wright. Second, when we said that Dugger "turned around and *drove back* to shoot at Wright," that should not be misunderstood to mean that Dugger left the immediate vicinity before making his U-turn. The evidence was that Dugger simply made a U-turn to the other side of the street as Wright "grabbed the [car] door."

[14] The dissent surmises that Wright's second-degree assault conviction was a misdemeanor, citing to Md. Code Ann., Crim. Law § 3-203(b). But the next subsection of that provision, § 3-203(c), makes clear that second-degree assault in Maryland can also be charged as a felony punishable by 10-years imprisonment (if perpetrated against an officer or other first responder). In the § 23-110 proceedings before us, Dugger asserted that Wright's second degree assault was "punishable by a term of incarceration of ten years," and the government offered no evidence to the contrary because it was "unable to locate its trial file and therefore was not aware" whether Wright's conviction was for a felony or a misdemeanor. In light of the record, we will not speculate on the point; it suffices to say that the government concedes it was a violent conviction that Wright could have been impeached with.

of events becomes significantly more suspect. If the jury doubted Wright's account, that would translate into a reasonable probability that it would not have convicted Dugger.

None of the other pieces of the government's case draw that conclusion into doubt. Though Napier and Huff testified that they did not see Wright with a gun, they both looked at Wright only after the initial volley of shots had been fired. If Dugger was telling the truth about Wright's gun jamming, there is little reason to think he would have kept the gun on open display by the time Napier and Huff saw him. And the evidence showed that officers never searched Wright or his nearby apartment, where he retreated after being shot, for a weapon. Huff instead chased after Dugger when he fled, leaving Wright with an opportunity to hide any weapon he might have had on him.

The fact that Dugger fled the scene is not particularly damning evidence given that it was undisputed that Dugger unlawfully possessed the firearm that he just fired, giving him ample reason to flee the scene even if he had acted in self-defense. *See Headspeth*, 86 A.3d at 565 (noting minimal probative value of flight evidence where accused "had reasons to flee that were consistent with innocence"). And a jury could certainly be skeptical of Dugger's supposed motive for targeting Wright. Wiggins

testified that, while Dugger had accused her of sleeping with somebody else, Wright was not the object of his suspicions. Only Wright, Wright's wife, and Vanderhall said otherwise, and aside from the aforementioned reasons to doubt Wright, Wright's wife had a clear motive to support her husband's version of events, and Vanderhall was teeming with credibility problems. He had at least half a dozen prior convictions—ranging from armed robbery to grand larceny—and a long history of cooperating with the government in exchange for lower sentences. As the Supreme Court has noted, "[j]urors suspect informants' motives from the moment they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and unreliable." *Banks v. Dretke*, 540 U.S. 668, 702 (2004) (quoting Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381, 1385 (1996)).

In sum, we think there is a reasonable probability that Bynum's deficiencies tilted the balance in the government's favor, and that but for his unprofessional errors, there is a reasonable probability that the jurors would not have convicted Dugger of most of the charges against him. We note five exceptions. There is not a reasonable probability that the deficiencies affected Dugger's convictions for (1) unlawful possession of a firearm, (2) possession of an unregistered firearm, (3) unlawful possession of ammunition, (4) reckless driving, or (5) fleeing a law

enforcement officer. Even if jurors thought Wright had fired at Dugger first, there is little reason to conclude that would have affected the jury's assessment of those particular charges.

## III.

We reverse the judgment of the Superior Court and vacate Dugger's convictions, except his convictions for unlawful possession of a firearm, possession of an unregistered firearm, unlawful possession of ammunition, fleeing, and reckless driving, which we affirm.

*So ordered.*

GLICKMAN, *Senior Judge*, dissenting in part: I agree with a good deal of the majority opinion, notably including its important conclusion that Bynum's misrepresentations of his qualifications to the court and to appellant, combined with his pretrial neglect of appellant's defense, were such gross deviations from professional norms that we cannot indulge the usual "strong presumption" that defense counsel "rendered adequate assistance and made all significant decisions in

the exercise of reasonable professional judgment."[1]  Indeed, it is tempting to say that no further inquiry into Bynum's performance is necessary for us to conclude that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[2]  However, Bynum was then a member of the court's bar, and appellant, after being cautioned appropriately by the court, freely made the choice to retain Bynum to replace his court-appointed counsel.  Given those circumstances, I also agree with my colleagues that this is not the case in which to "adopt a rule of per se ineffectiveness for gross misrepresentations of counsel's core competence to handle a matter." *Ante* at 23.

Where I part company with my colleagues is over their conclusion that Bynum rendered constitutionally ineffective assistance at appellant's trial based on three omissions on his part:  his failures (1) to move to strike Vanderhall's testimony that appellant had been a drug dealer, (2) to impeach Wright with his prior convictions, and (3) to object to an erroneous instruction allowing the jury to consider evidence of Wright's peaceful character.  I am not persuaded that, but for those three

---

[1] *Strickland v. Washington*, 466 U.S. 668, 689-90 (1984).

[2] *Id.* at 686.

omissions, there is a reasonable probability the jury would have acquitted appellant on any of the counts of the indictment.[3]

In assessing whether counsel's alleged errors were prejudicial, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."[4] The evidence that appellant shot Wright without provocation, and not in self-defense, was quite strong, as my colleagues acknowledge. *See ante* at 39 n.13. There are a few things I think worth emphasizing. First, while there was compelling evidence of appellant's hostility and motive to kill Wright,[5] there was

---

[3] *See id.* at 694-95 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.").

[4] *Id.* at 695; *see also id.* at 695-96 ("Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.").

[5] Wright and his wife testified that appellant had accused Wright of having an affair with Wiggins (appellant's girlfriend). Vanderhall testified that appellant told him this affair was why he shot Wright. Wiggins confirmed that appellant had

no evidence that Wright had any motive to shoot at his "best friend" (as both men described their long relationship). Second, there was no evidence, apart from appellant's own testimony, that Wright was armed at any point during the encounter.[6] Third, after shooting Wright in the initial encounter and starting to drive away after he was out of danger, appellant turned his car around (making a U-turn in the middle of on-coming traffic, according to Officer Huff) and drove back to fire a second, unprovoked volley of shots at the wounded Wright, who was then on the sidewalk across the street from appellant and not threatening him. Officer Huff testified that Wright appeared to be trying to dodge the bullets.[7]

accused her of "sleeping with somebody else," whom he did not name, and appellant's contemporaneous accusatory text messages to Wiggins were introduced in evidence. When he testified at trial, appellant admitted having accused Wiggins of cheating on him just a few days before he shot Wright. Moreover, appellant testified that he obtained the handgun he used to shoot Wright only two weeks earlier, after someone had fired a shot at him outside his parents' home. Although appellant said he did not know the identity of his assailant, he began to suspect it was Wright.

[6] Although appellant claimed that Wright shot at him from close range while he was sitting in his car, appellant was not hit and there was no bullet damage to the car. None of the witnesses to the encounter saw Wright with a gun at any time. They saw appellant shoot at an apparently unarmed man. At trial, Wright denied that he was armed.

[7] This was *after* appellant allegedly saw that Wright's gun had jammed. At trial, appellant denied shooting at Wright at all after he made the U-turn and drove back toward Wright. This denial, contradicted by all the witnesses, was hardly credible.

Thus, as the prosecutor pointed out in closing argument, even if the jury thought Wright might have been the first aggressor in the initial shooting encounter with appellant, the evidence still proved that appellant was guilty of assault with intent to kill while armed and the other charges against him, based on his shooting at Wright after that initial encounter had ended and appellant then returned to shoot Wright.

Given what I perceive to be the strength of the evidence against appellant, it is difficult for me to conclude that Bynum's three cited omissions made any difference to the outcome of the trial. None of the omissions went to the heart of the government's case. Subtract them all and it seems to me there would still have been no reasonable likelihood of a different verdict.

The first cited omission is Bynum's failure to move to strike Vanderhall's testimony that appellant sold drugs "back then," i.e., when Vanderhall associated with appellant for a period of three to four years beginning in 2004. (This was quite a number of years before appellant shot Wright, which occurred on September 11, 2015.) As the majority opinion concedes, however, Vanderhall's testimony "was perfectly responsive" to the questions he was asked, *ante* at 28 n.7, and a motion to

strike it therefore should not have been granted.[8]  Bynum's failure to make a motion that properly would have been denied cannot be deemed either deficient performance or prejudicial for purposes of evaluating an ineffective assistance claim.

Furthermore, and in any event, the prejudicial impact of Vanderhall's testimony that appellant dealt drugs many years earlier was surely *de minimis*.  The *casus belli* between appellant and Wright had nothing to do with drug dealing, and whether appellant was involved with drugs was no part at all of the strong prosecution case against him.[9]  The majority opinion cites the damaging implication

---

[8] *See Strickland*, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.").  The fact that the government does not make this point does not mean we should ignore it. "[P]rejudice determinations are legal in nature and are reviewed de novo." *Ante* at 19 (citing *Cosio v. United States*, 927 A.2d 1106, 1123 (D.C. 2007) (en banc)).

Recognizing that the trial court should not have granted a motion to strike, the majority opinion pivots and faults Bynum for inadvertently eliciting Vanderhall's testimony that appellant dealt drugs through careless questioning on cross-examination. *Ante* at 28 n.7.  This presupposes a claim of ineffectiveness based on professionally deficient and unreasonable cross-examination, which has not been made in this appeal and which the government has not had the opportunity to address.  We therefore should not address the claim sua sponte.

[9] The government did not take advantage of Bynum's elicitation of Vanderhall's testimony that appellant dealt drugs.  It did not pursue that topic in redirect examination of Vanderhall or in cross-examining appellant after he testified that he and Vanderhall had been mere acquaintances; nor did the government

that drug dealers have guns, but there was no dispute that appellant had a gun. If anything undercut his claim that Wright shot him first, it was not the possibility that appellant had the gun because he was a drug dealer; it was appellant's own testimony that he went and acquired the gun just two weeks before the shooting, which suggested appellant obtained the weapon to take revenge on the person whom he then believed was having an affair with Wiggins.[10]

The second cited omission is Bynum's failure to impeach Wright with his prior convictions in Maryland for second-degree assault and possession of a non-marijuana controlled substance. Here too, I am not persuaded by my colleagues' assertion that this failure "seriously undermined the defense." *Ante* at 34. The trial judge perceived that Wright's convictions would have inflicted only "minimal incremental damage" to his credibility, and I think the record supports that assessment. So does the law.

---

impeach appellant with his prior conviction for possession with intent to distribute a controlled substance. And the government made no mention of appellant's past drug dealing in its closing or rebuttal arguments.

[10] This inference is all the stronger given the weakness of appellant's own explanation that he obtained the gun because an unknown person shot at him outside his home for unknown reasons — an incident that appellant admittedly did not report to anyone.

As the majority opinion states, Wright's prior convictions would have been admissible, if at all, only for whatever value they would have had to impeach his credibility. *Ante* at 34 n.11. That value would not have been great. There is no claim that Wright's convictions (which apparently were for offenses designated by Maryland as misdemeanors[11]) would have been probative of a motive to curry favor with the government or other bias, and they were not of the kind that bears directly and adversely on a witness's testimonial veracity.[12]

My colleagues acknowledge that Wright's prior convictions would not have been admissible "to show his violent propensities." *Ante* at 34 n.11. The majority opinion also concedes that "[t]he rule in this jurisdiction is that only in homicide

---

[11] *See* Md. Code Ann., Crim. Law §§ 3-203(b), 5-601(c). The majority opinion correctly notes that Wright's second-degree assault conviction would have been a felony if it was committed against a police officer or first responder. *See id.* § 3-203(c). However, there is no indication in the record that this was so, and appellant has not claimed that Bynum could have impeached Wright's credibility with a felony offense.

[12] *See, e.g.*, *Gordon v. United States*, 383 F.2d 936, 940 (D.C. Cir. 1967) ("In common human experience acts of deceit, fraud, cheating, or stealing, for example, are universally regarded as conduct which reflects adversely on a man's honesty and integrity. Acts of violence on the other hand, which may result from a short temper, a combative nature, extreme provocation, or other causes, generally have little or no direct bearing on honesty and veracity. A 'rule of thumb' thus should be that convictions which rest on dishonest conduct relate to credibility whereas those of violent or assaultive crimes generally do not[.]" (footnote omitted)); *see also* *United States v. Estrada*, 430 F.3d 606, 617-18, 621 (2d Cir. 2005).

cases may prior violent acts of the victim be introduced as evidence to prove that the victim was the first aggressor."[13] Nonetheless, my colleagues contend that Bynum was ineffective in failing to introduce and use Wright's prior convictions for that very purpose. "In a case where the central question was who was the first aggressor," the majority opinion asserts, "failing to introduce evidence of Wright's violent criminal past, even if only as impeachment, seriously undermined the defense." *Ante* at 34 (footnote omitted). The majority's premise for this claim of Bynum's ineffectiveness is that "it would have been difficult for a jury to separate the proper from the improper use of this evidence," and the "impeachment evidence could easily — even if improperly — affect jurors' opinions about Wright's propensity for violence." *Ante* at 34-35 n.11.

As the Supreme Court made clear in *Strickland*, this line of reasoning is an improper basis on which to rest a claim of ineffective assistance of counsel:

> In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. . . . A defendant has no entitlement to

---

[13] *Ante* at 34 n.11 (quoting *Harris v. United States*, 618 A.2d 140, 144 (D.C. 1992)).

the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed.[14]

Thus, our "assessment of the likelihood of a result more favorable to the defendant must exclude the possibility" that the jury would have made improper use of evidence of Wright's (supposedly) violent criminal past.[15]  The majority opinion's surmise as to "the actual process of decision" in which the jury would have engaged "should not be considered in the prejudice determination."[16]

In any event, the majority opinion surely exaggerates the potential impact on the jury of Wright's two prior misdemeanor convictions (which did not involve any weapons and only one of which, it should be noted, was for assaultive conduct of any kind).  And Wright's doubtful and violent character was manifest in his testimony even without mention of his prior convictions, to the point that even the prosecutor had to acknowledge and address it at the outset of the government's closing argument, as follows:

> Now, let's talk about Samuel Wright for a second.  You don't have to like him.  You don't have to want to leave

---

[14] *Strickland*, 466 U.S. at 694-95.

[15] *Id.* at 695.

[16] *Id.*

53

> your kids with him. You don't have to want to be his best friend. . . . And when you're thinking about who you believe, think about the fact that you got the good, the bad, and the ugly with Samuel Wright. He didn't tell you everything you wanted to hear. He sat up on that stand and he told you, if I had gotten into that car and I had gotten that gun, I would have shot him.

(Wright had memorably testified that when appellant opened fire on him, his "man instincts" were to "put some blood up in that damn seat," and he had admitted having a tendency to "put [his] hands on people" and having been shot himself twice before. It was Bynum who, on cross-examination, elicited this vivid testimony from Wright, and Bynum returned to it in his closing argument.[17]) The majority opinion acknowledges, as it must, that Wright "was not what anybody would call an unimpeachable witness," and that there were significant reasons for the jury to consider his testimony implausible. *Ante* at 39-40. It was hardly necessary for Bynum to add Wright's past misdemeanor convictions to those reasons; they would have added virtually nothing.

---

[17] Bynum argued to the jury the seeming incongruity of Wright's behavior if, as Wright claimed, he was unarmed and appellant shot at him first: instead of running and ducking for cover, he "continued to approach the vehicle, trying to get into the vehicle that somebody was shooting at him from. . . . Who tries to get in a vehicle when somebody is shooting at you, especially if he'd been hit?"

The third cited omission is Wright's failure to object to the instruction that the jury had heard and could consider evidence of Wright's peaceful character. It was a mistake to give this instruction, but for several reasons we can be confident that the error was utterly innocuous. First, immediately before the court gave the "peaceful character" instruction, it specifically instructed the jury that "You've heard evidence about past acts of violence by Samuel Wright and that Timothy Dugger knew about those past acts. You may consider such evidence as bearing on the reasonableness of Timothy Dugger's fear for his own safety." Second, immediately after the instruction, the closing arguments of counsel reminded the jury of Wright's aggressiveness. Third, there was no evidence of Wright's peaceful character, and neither the court nor the prosecutor purported to identify such evidence. Fourth, Wright himself acknowledged his violent tendencies and never claimed to be a peaceful individual. Fifth, the government did not rely on or even mention the "peaceful character" instruction in its closing arguments. Sixth, there is no indication, such as a jury note, that the jury attached any significance whatsoever to that instruction.

For these reasons, I see no likelihood that the erroneous, isolated "peaceful character" instruction misled the jury into "recollecting" evidence it never received

and giving weight to non-existent "evidence" of Wright's peacefulness. If anything, Wright's aggressive character was a given, acknowledged at trial by all.

In sum, Bynum's three omissions were not prejudicial to appellant's defense; they were tangential to the case and inconsequential, individually and in combination. The record in my opinion does not support a conclusion that but for those omissions, there is a reasonable probability that the jury would have doubted the government's strong proof of appellant's guilt.